**UNITED STATES of America,**
**Appellant,**

v.

**James R. COSON, Appellee.**

**No. 16517.**

United States Court of Appeals
Ninth Circuit.

Jan. 23, 1961.

Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, A. F. Prescott, Kenneth E. Levin, Attys., Dept. of Justice, Washington, D. C., Laughlin E. Waters, U. S. Atty., Edward R. McHale, Asst. U. S. Atty., Los Angeles, Cal., for appellant.

Wadsworth, Fraser & McClung, Los Angeles, Cal., for appellee.

Before CHAMBERS, Chief Judge, POPE, Circuit Judge, and KILKENNY, District Judge.

POPE, Circuit Judge.

Coson, as plaintiff, filed his complaint in the court below alleging that he was the owner of certain described real property in Los Angeles County, California; that the defendant United States claimed an interest in and to that property by virtue of its filing on November 15, 1955, in the office of the County Recorder of that County, of a notice of federal tax lien No. 42005, for Federal Withholding taxes, Federal Insurance Contributions Act taxes for the second and third quarters of 1955, and Federal Excise Cabaret taxes for the months of July and August, 1955, amounting, altogether, to the sum of $133,691.80. He alleged that the Government's claim of lien was invalid for two reasons: first, because plaintiff had never been a general partner in Moulin Rouge (the partnership which operated the hotel and gambling establishment at Las Vegas, Nevada, whose operation gave rise to the taxes referred to); and second, for the reason that the defendant had never demanded that plaintiff pay the taxes referred to or any portion thereof as required by Title 26 U.S.C. § 3670.[1]

Plaintiff prayed for judgment that he was the owner of the property; that the defendant had no right, title, or interest in or to it or any part thereof; and that the notice of federal tax lien be cancelled and defendant enjoined from claiming any interest in the property under that lien.[2]

1. This was a reference to the 1939 Revenue Code.

2. In his brief here, and pending the appeal, plaintiff asked leave to amend his complaint by adding a paragraph reading as follows: "That the said claim of lien was arbitrarily and capriciously imposed by reason of the following facts:
1. No assessment upon which said lien was based was ever made against plaintiff;
2. No notice or demand for payment of taxes had been served upon plaintiff at the time of the commencement of this action;
3. No notice of the assessment had ever been furnished to plaintiff, within sixty days from the making of the assessment, or otherwise; and
4. Plaintiff was not a partner in the Moulin Rouge.

That the continued imposition of said lien upon plaintiff's real property will ruin and destroy plaintiff's property rights for the reason that plaintiff borrowed $133,500.00 from the California Bank which he used to purchase real property for $108,000.00 and did then enter into a twenty-year lease to erect a department store building on the said real property incurring and paying a leasing commission of $20,000.00; that thereafter, to-wit, on November 15, 1955, the

The complaint, as filed, based the jurisdiction of the district court upon Title 28 U.S.C. § 2410. In his brief plaintiff asks leave to amend to allege jurisdiction under Title 28 U.S.C. § 1340.

The court found and concluded that the Government has no lien for the taxes asserted in the notice of tax lien and judgment was ordered that it be declared that the United States has no lien for the taxes asserted in the notice of federal tax lien filed as against the property described in the complaint, and ordering that the United States refrain from any further assertion of such a lien based on the assessments which it made in 1955 "of Bisno, Rubin, and the Moulin Rouge."

■ Upon this appeal the principal attack made by the Government upon the judgment below is through its contention that the trial court was without jurisdiction to entertain the action. As previously noted, the complaint predicated jurisdiction upon the provisions of Title 28 U.S.C. § 2410. Subdivisions (a) and (b) of that section are set forth in the margin.[3]

The trial court, relying upon the decisions of this court in Seattle Association of Credit Men v. United States, 240 F.2d 906, and Wells v. Long, 162 F.2d 842, held that the effect of § 2410 is only a waiver of sovereign immunity and does not operate to confer jurisdiction upon a federal court to entertain such a suit

as this. The trial court proceeded, however, to hold that it had jurisdiction of the action by virtue of § 1340 of Title 28 which provides: "The district courts shall have original jurisdiction of any civil action arising under any Act of Congress providing for internal revenue, or revenue from imports or tonnage except matters within the jurisdiction of the Customs Court."

■ The appellant asserts that § 1340 will not support jurisdiction in this case for several reasons: first, that the suit is not one arising under an act of Congress providing for internal revenue. In support of this contention it cites Johnston v. Earle, 9 Cir., 245 F.2d 793. That was a case in which two officers of the Internal Revenue Bureau were sued for alleged tortious seizure and conversion to their own use of a tractor belonging to the plaintiff. This court held that § 1340 did not support the claimed jurisdiction since the recovery sought was solely for tortious conversion, a state tort, by one citizen of the state against other citizens of the same state. There was no claim for the return of federal taxes alleged to have been wrongfully assessed. We think that case is not in point here where the complaint puts in issue the validity of a claimed federal tax lien. In our view, as stated in United States v. Brosnan, 363 U.S. 237, 241, 80 S.Ct. 1108, 1111, 4 L.Ed.2d 1192, "such liens form part of the machinery

defendant did file a Claim of Lien upon the said real property and plaintiff is by reason thereof unable to erect the department store pursuant to the terms of said lease; that unless said lien is speedily removed plaintiff will become liable to the lessee for non-performance of the terms of said lease and may be required to file a petition in bankruptcy."

3. "§ 2410. Actions affecting property on which United States has lien (a) Under the conditions prescribed in this section and section 1444 of this title for the protection of the United States, the United States may be named a party in any civil action or suit in any district court, including the District Court for the Territory of Alaska, or in any State court having jurisdiction of the subject matter,

to quiet title to or for the foreclosure of a mortgage or other lien upon real or personal property on which the United States has or claims a mortgage or other lien.

"(b) The complaint shall set forth with particularity the nature of the interest or lien of the United States. In actions in the State courts service upon the United States shall be made by serving the process of the court with a copy of the complaint upon the United States attorney for the district in which the action is brought or upon an assistant United States Attorney * * *. In such actions the United States may appear and answer, plead or demur within sixty days after such service or such further time as the court may allow."

for the collection of federal taxes", and we think therefore that the Act of Congress which provided for such liens, was an Act of Congress "providing for internal revenue."

Second, the appellant says that § 1340 "at most is only a general grant of jurisdiction which in order to be effective must be buttressed by some other specific grant of jurisdiction governing any given case." In support of that position the Government cites only First National Bank of Emlenton, Pa. v. United States, 3 Cir., 265 F.2d 297, 299. That case is not in point here for it held no more than that § 1340 did not accomplish a waiver of sovereign immunity. All that the court held was that a suit "against the United States is not maintainable unless the sovereign has consented to be sued in such an action"; that such consent was not contained in § 1340, and that it found no such consent in Title 28 U.S.C. § 1346 (a) (1, 2), or § 2463.

We find no fault with anything that was said in that case, but we think it is of no assistance here where the court below relies upon Title 28 U.S.C. § 2410 for the Government's consent to be sued. If therefore the action here is one within the class of cases defined in § 1340 and if it also is the type of case with respect to which sovereign immunity was waived by § 2410, we should find that the trial court had original jurisdiction to entertain it.

We proceed to inquire whether this action comes within the language of § 1340. The first problem is whether it meets the test referred to in Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 672, 70 S.Ct. 876, 879, 94 L.Ed. 1194, where it is stated that "It has been settled doctrine that where suit is brought in the federal courts upon the sole ground that the determination of the suit depends upon some question of a federal nature, it must appear, at the outset, from the declaration or the bill of the party suing, that the suit is of that character."

We think that the case of Hopkins v. Walker, 244 U.S. 486, 37 S.Ct. 711, 713, 61 L.Ed. 1270, sufficiently discloses that the instant case meets the test just referred to. That was a case in which the owners of a patented placer mining claim brought suit against defendants who had filed certificates of location of lode claims based upon alleged discoveries of lodes within the exterior boundaries of the placer claim. It was alleged that there were no known lodes within the placer at the time of the application for patent and that in any event the lode claims asserted were excessive in area. The bill in the district court predicated jurisdiction upon the suit being one arising under the laws of the United States and involving the requisite amount in controversy. The Court noted the rule above stated with respect to what the cause of action must disclose to the effect that such a case arises where the statement of plaintiff's cause of action "unaided by any anticipation or avoidance of defenses, discloses that it really and substantially involves a dispute or controversy respecting the validity, construction or effect of a law of Congress." It held that the action satisfied that requirement because "in both form and substance the bill is one to remove a particular cloud from the plaintiffs' title, as much so as if the purpose were to have a tax deed, a lease, or a mortgage adjudged invalid and cancelled. It hardly requires statement that in such cases the facts showing the plaintiffs' title and the existence and invalidity of the instrument or record sought to be eliminated as a cloud upon the title are essential parts of the plaintiff's cause of action."

Such is the case here. The complaint not only alleges the plaintiff's title and ownership, but it sets out the notice of federal tax lien filed by the United States and specifically alleges two reasons why that claim of lien is invalid. The action here is as clearly one to remove a particular cloud from plaintiff's title as was the one considered in Hopkins v. Walker, supra.

This poses a further question whether such a suit comes within the provisions of § 2410 of Title 28 (see footnote 3,

supra), which grants permission to make the United States a party in a suit "to quiet title" to property on which the United States claims a lien.

It is plain that the words "quiet title" used in subdivision (a) in that section are not intended to refer to a suit to quiet title in the limited sense in which that term is sometimes used, (see the discussion in Hopkins v. Walker, supra, 244 U.S. at pages 490, 491, 37 S.Ct. at page 713), but that as used in the section here referred to it comprehends a suit to remove a cloud upon the title of a plaintiff. This is made plain both by the text and the history of the provision. Subdivision (b) of § 2410 makes it mandatory that "the complaint shall set forth with particularity the nature of the interest or lien of the United States." Plainly that stamps the action as one to remove a specific, particularly described, cloud upon the plaintiff's property. In a strictly limited type of suit to quiet title, such a particularization is never necessary. Not only does this language disclose that the words "quiet title" were used in a broad sense to cover a suit to remove a cloud on title but the legislative history of the insertion of this provision in the section demonstrates that it was intended to cover a suit of the character here before us.

It is shown by the Reviser's notes to the 1948 Judicial Code, that § 2410 was based on §§ 901 to 905 as they appeared in Title 28 of the 1940 edition of U.S.C. Prior to the Act of December 2, 1942, 56 Stat. 1026, § 901 referred merely to suits "for the foreclosure of a mortgage or other lien upon real estate, for the purpose of securing an adjudication touching any mortgage or other lien the United States may have or claim on the premises involved."

The language relating to suits to quiet title was inserted by amendment of the date last mentioned. That amendment followed a report, H.R. 1191, 77th Cong. First Session, dated August 15, 1941. Another amendment then provided for was designed to include actions with respect to personal property as well as those relating to real property, but the language relating to suits to quiet title was inserted pursuant to the recommendation of the then Attorney General of the United States who noted that at that time there was "no provision whereby the owner of real estate may clear his title to such real estate *of the cloud of a Government mortgage or lien.*" (Emphasis ours.) The text of the letter which served to bring about the insertion of the language we now consider is set forth in the margin.[4] In our opinion it is clear that the waiver of immunity exists for the specific type of suit here brought, namely, one to remove a cloud on the title.

We inquire next whether this is an action "arising under" any Act "providing for internal revenue" within the meaning of § 1340. Insofar as the plaintiff's claim is based upon an assertion that the Government's lien is void and ineffective because of a failure to make demand upon the plaintiff, (or for the other failures specified in the appellee's requested amendment, see footnote 2,

---

4. H.R. 1191, 77th Cong. First Sess. August 15, 1941. Permitting The United States To Be Made Party Defendant In Certain Cases Involving Personal Property. "It should be observed in this connection that under existing law there is no provision whereby the owner of real estate may clear his title to such real estate of the cloud of a Government mortgage or lien. Welch v. Hamilton (S.D.Calif.) 33 F.2d 224, and U. S. v. Turner, (C.C.A.8) 47 F.2d 86. In many instances persons acting in good faith have purchased real estate without knowledge of the Government lien or in the belief that the lien had been extinguished. In other instances, mortgagees have foreclosed on property and have failed to join the United States. It appears that justice and fair dealing would require that a method be provided to clear real estate titles of questionable or valueless Government liens. Accordingly, I suggest that the bill be amended by inserting the phrase 'to quiet title or' between the words 'matter' and 'for the foreclosure of' in line 4 of page 2 of the bill."

supra),[5] it must be said that the suit "really and substantially involves a dispute or controversy respecting the validity, construction, or effect of such a law, upon the determination of which the result depends." [6]

Plainly enough as concerns his contention that the lien claimed by the United States is void because of want of prior demand, plaintiff undertook to bring a suit the result of which depends upon the meaning of Title 26 U.S.C. § 6321 which provides for a lien in favor of the United States against the property of a person liable for a tax who "neglects or refuses to pay the same *after demand.*" (Emphasis added.) He cites authority to support his claim that the effect of the law was that a lien upon his property was dependent upon a prior demand to him personally. The result so far as that portion of the case is concerned would turn upon the determination of that question which is one involving the construction or effect of the law.[7]

For reasons hereafter noted we find it unnecessary to consider (except as it bears on the question of whether proper demand was made) the other ground named in the complaint, namely, that Coson never became liable for the taxes.[8]

■ The appellant raised one other question relating to the court's jurisdiction to hear the case. It is contended that this suit, which as we have noted is essentially one to remove a cloud upon the plaintiff's title, is tantamount to an attempt to enjoin collection of taxes in violation of § 7421 of the 1954 Internal Revenue Code, which provides that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court." A similar provision was in § 3653 of the 1939 Code.

We think that this argument proves too much, for § 2410 of Title 28 was enacted as positive law by the Act of June 25, 1948. We cannot assume that all Government tax liens were excluded from

5. The propriety of the allowance of an amendment of the complaint pending an appeal is well settled. See Mullaney v. Anderson, 342 U.S. 415, 72 S.Ct. 428, 96 L.Ed. 458.

6. The phraseology quoted here is from Shulthis v. McDougal, 225 U.S. 561, 569, 32 S.Ct. 704, 706, 56 L.Ed. 1205. This in substance has been repeated many times. See for instance the language first above quoted from Hopkins v. Walker, supra, and the cases cited in South Side Theatres v. United West Coast Theatres Corp., 9 Cir., 178 F.2d 648, 649, in support of the following statement: "An action so arises where an appropriate statement by the plaintiff, unaided by an anticipation or avoidance of defenses, shows that it actually and substantially involves a controversy respecting the validity, construction, or effect of an act of Congress upon the determination of which the result depends."

7. We have been discussing the language used in § 1340, supra, which is the section relied upon by the trial court. While the court made no formal finding as to the amount in controversy here, it is plain that, as the sum named in the complaint suggests, the amount actually in controversy was in excess of the amount required by Title 28 U.S.C. § 1331 to support an action which "arises

under * * * laws * * * of the United States." Since, aside from the amount in controversy matter, the considerations involved are the same whether § 1340 or § 1331 is applied, we see no point in remanding the case for a special finding that the matter in controversy exceeds the requisite sum or value to satisfy § 1331.

8. If this were the sole basis for the complaint we might have to consider a rule once announced by this court, apparently not recognized elsewhere, that a case does not "arise under" a federal statute where the meaning of the statute is not in question, but the case turns solely on issues of fact. See Marshall v. Desert Properties, Inc., 9 Cir., 103 F. 2d 551, 552. But see contra: Hart and Wechsler, "The Federal Courts and the Federal System", p. 763, and Mishkin, "The Federal 'Question' in the District Courts," 53 Columbia Law Review 157, pp. 169 et seq. Regardless of the correctness of our decision in the Marshall case, the court here might, were it necessary, consider this second ground of the complaint under its "pendent" jurisdiction. See Hurn v. Oursler, 289 U.S. 238, 246, 53 S.Ct. 586, 77 L.Ed. 1148; Romero v. International Terminal Co., 358 U.S. 354, 380, 79 S.Ct. 468, 3 L.Ed.2d 368.

the meaning of § 2410(a). Yet such would be the result if the prohibition against injunctions operated to prevent the maintenance of an action such as this. Plainly § 2410 authorizes it. We agree with the holding of the trial court that the prohibition against suits to restrain collection or assessment of taxes has no bearing upon this case which is one for a wholly different purpose.[9] We think it plain that the only type of relief needed here is a decree holding the tax lien a cloud on plaintiff's title and cancelling it. There is no need for any injunctive relief. We hold that the court below had jurisdiction.

■ This brings us to the merits of the case. The court's opinion, which the Judge treated as his findings, found there had been no notice or demand respecting these taxes given to Coson, individually, prior to commencement of his action. He also found: "Between March and August of 1955, plaintiff invested $31,000 in a newly organized Las Vegas, Nevada, hotel and gambling establishment known as the 'Moulin Rouge,' and obtained a 1.70 per cent interest therein. He reasonably and in good faith thought he was investing as a limited partner in a limited partnership. The Moulin Rouge was not, however, a limited partnership. Upon first ascertaining this, plaintiff promptly mailed notices of renunciation."[10] [169 F.Supp. 672]

The Moulin Rouge establishment and operations were conducted in the State of Nevada. In preparation for carrying out the declared intention of the organizers, articles of limited copartnership were prepared but the required certificate was never filed with the county recorder. Nevada had adopted the Uniform Partnership Act (now Nevada Revised Statutes, §§ 87.010–87.430), and the Uniform Limited Partnership Act (now Nevada Revised Statutes, §§ 88.010–88.310). § 88.120, which is § 11 of the Uniform Limited Partnership Act, provided as follows: "A person who has contributed to the capital of a business conducted by a person or partnership erroneously believing that he has become a limited partner in a limited partnership, is not, by reason of his exercise of the rights of a limited partner, a general partner with the person or in the partnership carrying on the business, or bound by the obligations of such person or partnership; provided, that on ascertaining the mistake he promptly renounces his interest in the profits of the business, or other compensation by way of income."

The announcement of the intended formation of Moulin Rouge, the brochures, prospectuses, leases, and contracts relating to the business, all described it as a limited partnership, and gambling licenses were issued to it as "a limited partnership". That everyone connected with the enterprise intended that it be a limited partnership cannot be questioned. What became of Coson's money which he

---

9. We note also that the prohibitions of § 7421 are not without exceptions. Appellee's brief asserts that the amount of the claimed lien is so great that he could not, because of his financial limitations, pay the tax and sue to recover the amount; that this leaves him utterly unable to employ the usual device of paying and suing to recover back. If such were the facts, this might be a case "where complainant shows that in addition to the illegality of an exaction in the guise of a tax there exist special and extraordinary circumstances sufficient to bring the case within some acknowledged head of equity jurisprudence," and hence that "a suit may be maintained to enjoin the collector". Miller v. Standard Nut Margarine Co., 284 U.S. 498, 509,

52 S.Ct. 260, 263, 76 L.Ed. 422. If such were plaintiff's predicament, his hardship would resemble that of Griffin in Griffin v. People of the State of Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891. A party financially unable to use a remedy available to those more advantaged would appear to suffer extraordinary hardship. See Lassoff v. Gray, 6 Cir., 266 F.2d 745, 747.

There is no finding to support such a position here and we find no cause for a remand for any such purpose.

10. As hereafter noted, this quoted finding has particular significance upon the question whether notice to Moulin Rouge and Bisno and Rubin was sufficient notice or demand upon Coson.

intended to invest in a limited partnership does not appear for his name did not appear in any of the books, accounts or records of the enterprise either as lender, investor or otherwise. At one time Coson at the request of one Zalk prepared a financial statement in response to Zalk's representation that such a statement would need to be furnished to the state licensing authorities in connection with the gambling license for Moulin Rouge, but the record does not show that these were ever used or presented to the state authorities; and that they were not used is confirmed by the fact that Coson's name was not listed on the gambling license although the names of some twenty-five other persons were; and it appeared that those twenty-five persons between them held 100% of the ownership of the enterprise.[11]

There is evidence that Coson thought he acquired a 1% interest in the enterprise which he believed was a limited partnership, but evidence is lacking that this object was ever accomplished. A witness who had been a legal adviser for the organizers of the enterprise, at the time of the trial a Superior Court judge in Los Angeles, testified that the books of Moulin Rouge showed no interest of Coson in the enterprise, and that Bisno, one of the two managing partners, had taken credit for money received from many people in his own name as his own capital.

It also appears that in September, 1955, after the enterprise had gotten into financial difficulties, a substantial number of investors or would-be investors gathered at Las Vegas, where the enterprise was carried on, for the purpose of reorganizing the business and creating a corporation. At that time Coson learned that the books and records of Moulin Rouge failed to disclose that he had any interest therein. The attorney mentioned above also testified that he met Coson at that meeting; that Coson asked him whether he, Coson, appeared to have any money or interest in Moulin Rouge, to which the attorney replied that the books did not disclose anything of that character; that although stock certificates in the proposed new corporation were being distributed at that time to persons who appeared on the books as creditors or investors, Coson received none of those.

There is in evidence an exhibit which is a certified copy of a special tax return made on Form 11(C) disclosing a tax liability for slot machine taxes amounting to $19,750. The return called for a list of names and addresses of all owners to be attached, and attached to that was a list of individuals which included Coson with his address. This was filed with the district director and purported to be a return for the period ending June 30, 1956; it was dated June 30, 1955, and signed by Rubin, one of the partners mentioned above.

The record shows how Coson's name came to be attached to that return. One Engle, a certified public accountant who represented the Moulin Rouge in the preparation of the return in question, and who believed it to be a limited partnership, explained that Rubin had given him Coson's name as one of a group of individuals "who were prepared to make application to purchase an interest in Moulin Rouge". He stated that it was his understanding that these applications had not yet been made; his thought was that if the new owners came into the enterprise after a slot machine license was procured, it would be necessary to procure another license because of such new members, and that this would involve the expenditure of another $19,000 for slot machine taxes; that if a partnership procured a slot machine license and then a partner were dropped, the enterprise could continue under the same license providing the internal revenue service was notified, "and you would not

---

11. On December 24, 1956, the Gaming Control Board recited: "The files reflect no information re a Mr. Zalk and Mr. Coson. An invested capital statement was submitted, however an application was never submitted and the two subjects were never processed for a license."

have to take a new stamp, but if you added new partners you may have to add new stamps." He said that he decided there would be nothing wrong in putting down on the list of owners "all of the people that we knew of that would be making application for the purpose of an interest in the Moulin Rouge." He further testified that Coson's name did not appear as an owner of an interest in the Moulin Rouge on the latter's books and that the first time he heard of Coson was when Rubin suggested that Coson's name be added to the list which was attached to the return. He spoke of Coson and Zalk with whom Coson was associated as "potential" investors.

On the basis of the court's finding and all of the evidence in the case the only conclusion to be drawn is that Coson was simply not a member of the partnership.[12] Our decision on this point is ruled by Giles v. Vette, 263 U.S. 553, 44 S.Ct. 157, 161, 68 L.Ed. 441. The facts in that case were similar to those here. It was claimed that Hecht and Finn were members of a certain partnership because they had contributed to its capital. The partnership was operated in the State of Illinois where both the Uniform Partnership Act and the Uniform Limited Partnership Act were in effect, S.H.A. ch. 106½, §§ 1 et seq., 44 et seq., the same as is the case in Nevada. Both Hecht and Finn erroneously believed they had become limited partners in a limited partnership; they made the renunciation provided for by § 11. This renunciation was not made until after creditors had filed petitions in bankruptcy against the partnership and a receiver had been appointed. It was found that the § 11 renunciation was made within a reasonable time notwithstanding. The court said at pages 563–564, at page 161 of 44 S.

Ct.: "Hecht and Finn contributed to the capital of the business, and each erroneously believed that he had become a limited partner in a limited partnership. Neither took any part in the control of the business or exercised any rights or powers in respect of it other than those which might belong to one not a general partner. * * * They made the renunciation provided for. No person suffered any loss or disadvantage because it was not made earlier, or because of reliance on any statement in the certificate. * * *

"Section 11 is broad and highly remedial. The existence of a partnership—limited or general—is not essential in order that it shall apply. The language is comprehensive, and covers all cases where one has contributed to the capital of a business conducted by a partnership or person erroneously believing that he is a limited partner. It ought to be construed liberally, and with appropriate regard for the legislative purpose to relieve from the strictness of the earlier statutes and decisions."

An interesting thing about that case is that it was held that Hecht and Finn were not liable as general partners at all. The creditors in that case had all become creditors prior to the time of the § 11 renunciation, for the bankruptcy preceded it. The legal situation was that they were never partners.

It is not important whether it be said that the renunciation here operated to relieve Coson from liability *ab initio*, (Cf. Oteri v. Scalzo, 145 U.S. 578, 588, 12 S.Ct. 895, 36 L.Ed. 824) or whether we say that Coson was not a general partner at any time, first because he never had the necessary intent to join a partnership in that capacity,[13] and sec-

---

12. Inexplicably, appellant's brief says: "The District Court has found that Coson was a member of the partnership Moulin Rouge and that that partnership was not a limited partnership." The record shows no such finding. It shows, on the contrary, that appellant, in its Points on Appeal, complained that "The District Court erred in failing to find and

to hold that plaintiff was a general partner in the 'Moulin Rouge' a general partnership." Appellant's brief does not contend that Coson did not make the mistake stated in the quoted finding or that he did not make prompt renunciation as the court found.

13. Of course an intent to become a general partner may be inferred from conduct.

ond, because his renunciation under § 11 was fully effective.

Since Coson himself had no part in the insertion of his name on the tax return previously described and knew nothing about it, it cannot be said that he represented or held himself out as a partner or consented to any such representation or holding out. He was neither an actual partner nor a partner by estoppel.

At the trial some emphasis was placed on the fact that near the end of July, 1955, one Tonis, purporting to be the owner of an undivided 3½% interest in the Moulin Rouge business, assigned that interest to Coson and Zalk. Coson testified that it was his understanding this was an assignment of an interest in a limited partnership. However, even if this were an assignment of an interest in a general partnership, it could not operate to make Coson a member of any such partnership. The transfer by a partner of his partnership interest does not make the assignee of such interest a partner in the firm. Hazen v. Warwick, 256 Mass. 302, 152 N.E. 342; Johnston

v. Ellis, 49 Idaho 1, 285 P. 1015; Bynum v. Frisby, 73 Nev. 145, 311 P.2d 972.[14]

All of this is significant in view of the fact that on December 27, 1956, when this suit was started, no notice or demand concerning these taxes had been given to or served upon Coson. This procedural prerequisite to the securing of a Government lien for such taxes is made plain by the statute. See Detroit Bank v. United States, 317 U.S. 329, 335, 63 S.Ct. 297, 87 L.Ed. 304. § 6321 of Title 26 U.S.C. recites that the amount of taxes shall be a lien upon the property of a person liable to pay the tax who "neglects or refuses to pay the same after demand." [15] The procedure for making such demand is set forth in § 6303(a) of the same title as follows: "Where it is not otherwise provided by this title, the Secretary or his delegate shall, as soon as practicable, and within 60 days, after the making of an assessment of a tax pursuant to § 6203, give notice to each person liable for the unpaid tax, stating the amount and demanding payment thereof. * * *" The only notices and demands which were given or

In this case no such conduct was shown. Coson had nothing to do with the management of Moulin Rouge, or with its organization. The only conduct shown on his part was consistent solely with his belief that he was dealing with a limited partnership. The ancient rule that a failure to comply with statutory provisions required to form a limited partnership renders the association a general partnership, (cf. 68 C.J.S. Partnership § 461, p. 1015) vanished with the enactment of the Uniform Limited Partnership Act. As stated in the Commissioners' Note on the Act: "Third: The limited partner not being in any sense a principal in the business, failure to comply with the requirements of the act in respect to the certificate, while it may result in the nonformation of the association, does not make him a partner or liable as such. The exact nature of his ability [liability] in such cases is set forth in Sec. 11." Vol. 8, p. 4 Uniform Laws Annotated.

14. In the case last cited the court, after quoting from the Nevada Uniform Partnership Act, said (at page 975 of 311

P.2d): "It is clear from this provision that an assignment of a partnership interest from one partner to a stranger does not bring that stranger into fiduciary relationship with the remaining partners nor require them to resort to dissolution in order to prevent such a relationship from arising. The stranger remains a stranger entitled only to share in the partnership's worth and to demand an accounting upon dissolution." The Nevada case is of interest in that it notes that the partners remaining in the firm were under no fiduciary duty to give information concerning the firm to the new assignee. The absence of such a duty shows the reason why notice to a partnership would not be notice to such an assignee for there could be no inference that the information would be passed on to him.

15. § 6321, 26 U.S.C.: "If any person liable to pay any tax neglects or refuses to pay the same after demand, the amount * * * shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person."

served were addressed to "Alexander Bisno and Louis Rubin, Moulin Rouge, 900 W. Bonanza Rd., Las Vegas, Nevada." These were given in August, September and October, 1955. The argument of the Government is that those notices constituted sufficient notice to Coson to sustain a lien upon his property because Coson was in law a general partner; that in respect to this type of taxes, the taxes constituted an obligation of the partnership, as such, and hence an obligation of each of the partners. Says the Government: "It is an established principle of partnership law that notice and/or demand on one or more partners is notice to all."

The fallacy in this is the assumption that Coson became a general partner. No authority has been cited for the Government's claim that notice given to Bisno and Rubin would serve as a notice and demand on Coson; nor has our research turned up any support for the Government's contention in that regard. What the Government has attempted to do here is to rely upon the obsolete rule mentioned in footnote 13 supra, that when an attempt to create a limited partnership is abortive or defective for any reason (as for failure to file a certificate) the would-be limited partners automatically become general partners. As noted in Giles v. Vette, supra, 263 U.S. at page 562, 44 S. Ct. at page 160, this strict ruling was carried so far that in the words of the Commissioners' Note it "deprived the existing statutory provisions for limited partners of any practical usefulness." It was to do away with that ancient rule that the Uniform Act was drafted. See Giles v. Vette, supra; Gilman Paint & Varnish Co. v. Legum, 197 Md. 665, 80 A.2d 906, 29 A.L.R.2d 286. And see note under § 11 in 8 Uniform Laws Ann. p. 24.

It will be noted that our decision here is based upon our holding that the Government's lien was irregular, insufficient and valueless from a procedural standpoint for failure to serve the statutory notice and demand in connection therewith and for failure to comply with required procedures.

In developing that conclusion many circumstances tend to show that not only were these required procedures not complied with but that Coson was not a taxpayer and not liable for the tax to begin with. Whether that non-liability could also constitute the basis for a suit of this kind, or for relief under § 2410(a) of Title 28, we need not here decide. The recent case of Pipola v. Chicco, 2 Cir., 274 F.2d 909, 914, appears to give a negative answer to that question. But that case agrees with what we hold here, that in an action of the kind here involved plaintiff may attack the Government lien for taxes as irregular or valueless "from a procedural standpoint", and may raise the question whether the Government "complied with required procedures * * * or whether by error the assessment was made against a taxpayer other than the one intended." [16]

---

16. The court in Pipola accepted the Government's argument that the plaintiffs could not question the assessment on the merits or question the liability of the taxpayer for the tax, but that the only permissible issue that could be tried would be whether or not the lien was defective or valueless from a procedural standpoint or for failure to comply with required procedures. It was said that this distinction between the merits of the assessment or the liability for the tax on the one hand, and procedural defects on the other, was the same distinction that would be applied had the Government sought to collect the tax by an action under § 3678 of the 1939 Revenue

Code (§ 7403 of the 1954 Code). Said the court (at page 912): "In a suit by the government to enforce a tax lien under § 3678, the defendant clearly can raise such questions as whether the assessment complied with required procedures * * * or whether by error the assessment was made against a taxpayer other than the one intended." The court also said, speaking of the Attorney General's letter referred to in the report mentioned supra, (footnote 4), that the court thought that the Attorney General was speaking "not of cases where an assessment might lack merit but of liens that were irregular from a procedural standpoint, that had been filed

Since our decision here is not based upon any holding that the assessment of the taxes was without merit,—no suggestion is made that the assessment of the partnership was improper,—but rather upon the ground that the lien was valueless for want of compliance with required procedures (as well as because it was filed against property not belonging to the taxpayer), we find no occasion here for comment as to whether we agree with the views expressed in the Pipola case, supra.

In holding as we do that the lack of proper notice or demand was fatal to the acquisition of the Government's lien against Coson, the emphasis here is somewhat different than that employed by the trial judge who held that the assessment itself was void as against Coson because the taxes were never assessed to Coson, the record of assessment in the office of the Bureau making no reference whatever to Coson. The Government argues that there is no requirement that an assessment be made against any person. Although our decision as to the lack of proper notice or demand is sufficient to dispose of this case, it would appear that the trial court was right in holding the assessment was insufficient for failure to comply with the statutory requirements.[17]

That portion of the amendment of the complaint requested here, through the paragraph thereof numbered "4", (see note 2, supra), which conforms to the proof and the findings, is allowed.

The judgment is modified by eliminating therefrom the sentence reciting that defendant "is hereby permanently enjoined from further asserting any claim of lien" and inserting the following: "It is further ordered, adjudged and decreed that the asserted lien for taxes as set forth in the Federal Tax Lien as filed, is null, void and valueless, and a cloud upon the title of plaintiff to the aforesaid property and the same is hereby cancelled and removed as a cloud upon said title."

As so modified, the judgment is affirmed.

---

against property not belonging to the taxpayer or that were valueless for other reasons not going to the merits of the assessment." Cf. United States v. Morrison, 5 Cir., 247 F.2d 285, 290.

In the Pipola case Chicco was an individual who owned the premises where the business of accepting wagers was carried on. The taxes were assessed against Chicco.

In the case before us the taxes were assessed against Moulin Rouge of which Coson was not a member. It may be said here that this case presents a question "whether by error the assessment was made against a taxpayer other than the one intended", or whether this was a lien "that had been filed against property not belonging to the taxpayer" within the meaning of that language in the Pipola case.

The holding in Pipola, otherwise without precedent, was based on that court's interpretation of certain language used in Bull v. United States, 295 U.S. 247, 55 S.Ct. 695, 79 L.Ed. 1421.

17. § 6203 of Title 26 prescribes the method of assessment as follows: "The assessment shall be made by recording the *liability of the taxpayer* in the office of the Secretary or his delegate in accordance with rules or regulations prescribed by the Secretary or his delegate. Upon request of the taxpayer, the Secretary or his delegate shall furnish the taxpayer a copy of the record of the assessment." (Emphasis supplied.)

The regulation on assessment and collection is as follows: "§ 301.6203.1. Method of Assessment.—The district director shall appoint one or more assessment officers, and the assessment shall be made by an assessment officer signing the summary record of assessment. The summary record, through supporting records, *shall provide identification of the taxpayer*, the character of the liability assessed, the taxable period if applicable, and the amount of the assessment. * * * If the taxpayer requests a copy of the record of assessment the district director shall furnish the taxpayer a copy of the pertinent parts of the assessment which set forth the name of the taxpayer, the date of assessment, the character of the liability assessed, the taxable period, if applicable, and the amounts assessed." (Emphasis added.)