ELIZABETH BLOW; PETER G. BOUGADES; MOLLIE L. BROWN; STEPHEN J. CHENEY; MARGARET CHENEY; THELMA A. CHURCHILL; HERMAN O. CLARK; PAUL COWGILL; ROBERT A. COX; JESSE B. DAVIS; R. EARL DAVIS; R. EARL DAVIS, CUSTODIAN FOR CHRISTY M. DAVIS AND MARK DAVIS, MINORS; GEORGE W. DUFFIELD; PAUL FAIRBETTER; ALMA FARAH; ALBERT FARAH; ALINE W. FLEMING; MOLLY GLANDER; KENNETH GLANDER; ROBERT HASSELL; MARK L. HITCHCOCK; DIANE HORNE; E. LEE HORNE, JR.; GAYLE B. HORTON; WILLIAM JACKSON, CUSTODIAN FOR DANIEL E. JACKSON AND SCOTT JACKSON, MINORS; GLEN V. JOHNSON; JERRY J. JOHNSON; BARNEY JOYNER; PHYLLIS JOYNER; W. M. KIRVEN; JAMES W. KNIGHT; TERRY R. KNIGHT; JAMES W. KNIGHT, CUSTODIAN FOR MARIE LYNN KNIGHT AND KELLY RENEE KNIGHT, MINORS; RUSSELL LaVIOLETTE; DANIEL C. MARKS; HANS G. MICHEL; BRAD MINSHEW, CUSTODIAN FOR MARY ELIZABETH MINSHEW AND TERESA LEMAN MINSHEW, MINORS; JOHN H. MITCHELL; MARJORIE MOORE; CARLOS W. MURRAY, JR.; ELLIS NASSIF; ELIZABETH NASSIF; WILLIAM J. O'DONNELL; THOMPSON G. PACE, III; JANE F. RABIL; MICHAEL RABIL; ROSELYN R. RABIL; LEROY REGISTER; JOHN O. TOBLER; CHERYL UPHAM; MARJORY K. UPHAM; AND JAMES B. UPHAM v. JEFFREY JOHN SHAUGHNESSY; WHEAT, FIRST SECURITIES, INC.; W. LARRY OWNLEY; LEE FOLGER, III; MERRILL LYNCH, PIERCE, FENNER & SMITH, INCORPORATED; RONALD GROVE; BACHE HALSEY STUART SHIELDS INCORPORATED; ROBERT WALTERMAN, AND MAUREEN BERRY

No. 8310SC340

(Filed 17 April 1984)

**Arbitration and Award § 1; Partnership § 1.2— investors suing security dealers and brokerage firms—agreement to arbitrate properly not enforced**

In an action in which plaintiffs, a group of investors, alleged defendants, security dealers and brokerage firms, used money supplied by plaintiffs to engage in a course of trading in securities that was highly speculative and in

violation of the fiduciary duties owed by them to plaintiffs and that when the trades and investments so made began to lose money, the defendants conspired to misrepresent and to avoid disclosing to plaintiffs the full extent of the activities and the losses sustained, the trial court did not err in denying defendants' motions to stay proceedings in trial court pending arbitration of the matters raised in plaintiffs' complaint for the following reasons: (1) there was no evidence plaintiffs were aware of or signed customer agreements containing the arbitration clause; (2) no limited partnership existed as contended by defendants in that no certificate of limited partnership was filed with the Register of Deeds as provided by G.S. 59-2; (3) under G.S. 59-11, no general partnership was formed; and (4) in cases such as this, there is a strong precedent of both cases and federal rules looking unfavorably at arbitration as a means to settle the dispute.

APPEAL by defendants Wheat, First Securities, Inc., W. Larry Ownley, Lee Folger, III, Merrill Lynch, Pierce, Fenner and Smith, Inc., Ronald Grove, Bache Halsey Stuart Shields, Inc., Robert Walterman, and Maureen Berry from *Farmer, Judge.* Order entered 3 December 1982 in Superior Court, WAKE County. Heard in the Court of Appeals 16 February 1984.

At all times pertinent to this action, defendants Ownley and Folger were employees of Wheat, First Securities, Inc. (hereinafter Wheat). They, along with Wheat, may be referred to in this opinion as the Wheat defendants. Similarly, defendant Grove was an employee of Merrill Lynch, Pierce, Fenner and Smith, Inc. (hereinafter Merrill Lynch). Merrill Lynch and Grove may be referred to as the Merrill Lynch defendants. Defendants Walterman and Berry were employees of Bache Halsey Stuart Shields (hereinafter Bache). They may be referred to as the Bache defendants.

This is a civil action wherein plaintiffs seek damages allegedly arising from a course of dealing with defendants. The essential facts of the case are as follows:

Beginning in 1979, the individual plaintiffs purchased a number of "units" in Capital City Investments. Capital City Investments (hereinafter CCI) was organized in 1979 by defendant Shaughnessy, who sold the "units" to plaintiffs. Each purchaser entered into a written agreement with defendant Shaughnessy. The agreement indicated the number of units purchased and the price per unit as well as the total purchase price. The price per unit ranged from approximately $69.00 to $100.00 between 1979

and late 1981. Depending on when the purchase was made, the agreement denoting the purchase took one of two forms. The first form was designated "Capital City Investments Subscription Agreement" and provided, in part, as follows:

> The undersigned acknowledges that he/she has been furnished and has read a copy of the Limited Partnership Agreement and understands that Jeffrey John Shaughnessy shall be the sole General Partner and Managing Partner of the partnership, that he/she is a citizen and resident of the State of North Carolina, and that the purpose of this limited partnership is as set forth in the document hereinabove referred to which has been furnished to the undersigned.

The second form was designated "Capital City Investments Purchase Agreement." The comparable provision in the second form reads:

> The undersigned acknowledges that he/she has been furnished and has read a copy of the partnership agreement and understands that Jeffrey John Shaughnessy shall be the sole General Partner and Managing Partner of the partnership and the the [sic] purpose of this partnership is as set forth in the document herein [sic] above referred to.

The limited partnership agreement referred to in the "Subscription Agreement" is designated "Limited Partnership Agreement of Capital City Investments" and sets forth the following "Objects and Purposes of Partnership":

> The Partnership is organized to invest and trade, on margin or otherwise, in capital stock, warrants, bonds, notes, debentures, trust receipts, commodities futures contracts, and other securities of any corporation or entity, in rights and options relating thereto, including put and call options (all such items being called herein ["] Securities"), to sell securities short and cover such sales; and to enter into, make and perform, all contracts and other undertakings and engage in all activities and transactions, as may be necessary or advisable or incident to the carrying out of the foregoing.

The Limited Partnership Agreement also establishes defendant Shaughnessy as the general partner and sole manager of the partnership and addresses such other matters of partnership opera-

tion as the general partner's liability to the limited partners, compensation of the general partner, methods of record keeping and accounting, among others. The Limited Partnership Agreement also contains the following provision:

> *Names of Partners.* Jeffrey John Shaughnessy is the General Partner and the Managing Partner (herein called "General Partner"), and the Limited Partner(s) [(] herein called "Limited Partner(s)") to be designated as such on the signature page of this Agreement.

However, there is no indication that the agreement was signed by any of the CCI investors. Defendants concede in their brief that no certificate of limited partnership was ever filed in the office of the Register of Deeds of Wake County, the apparent principal place of business.

Thereafter, defendant Shaughnessy executed customer agreements with each of the corporate defendant securities brokerage firms through the individual defendant securities dealers who are employed by the firms. The first agreement was with defendant Merrill Lynch and was entered into on or about 10 August 1979. Among other things, the customer agreement with Merrill Lynch provides for the arbitration of disputes between the parties to the agreement as follows:

> 11. It is agreed that any controversy between us arising out of your business or this agreement, shall be submitted to arbitration conducted under the provisions of the Constitution and Rules of the Board of Governors of the New York Stock Exchange, Inc. or pursuant to the Code of Arbitration Procedure of the National Association of Securities Dealers, Inc., as the undersigned may elect. If, the controversy involves any security or commodity transaction or contract related thereto executed on an exchange located outside the United States, then such controversy shall, at the election of the undersigned, be submitted to arbitration conducted under the constitution of such exchange or under the provisions of the Constitution and Rules of the Board of Governors of the New York Stock Exchange, Inc. or the Code of Arbitration Procedure of the National Association of Securities Dealers, Inc. Arbitration must be commenced by service upon the other of a written demand for arbitration or a written notice of inten-

tion to arbitrate, therein electing the arbitration tribunal. In the event the undersigned does not make such designation within five (5) days of such demand or notice, then the undersigned authorizes you to do so on behalf of the undersigned.

Under the heading designated "SIGNATURES" at the end of the agreement the following appears:

(Partnership)

Capital City Investments
  (Name of Partnership)

By s/Jeffrey J. Shaughnessy
       (A Partner)

On or about 24 August 1979, defendant Shaughnessy entered into a similar agreement with defendant Bache. That agreement also contained a provision relating to arbitration:

14. This contract shall be governed by the laws of the State of New York, and shall inure to the benefit of your successors and assigns, and shall be binding on the undersigned, his heirs, executors, administrators and assigns. Any controversy arising out of or relating to my account, to transactions with or for me or to this agreement or the breach thereof, and whether executed or to be executed within or outside of the United States, except for any controversy arising out of or relating to transactions in commodities or contracts related thereto executed on or subject to the rules of a contract market designated as such under the Commodity Exchange Act, as amended, shall be settled by arbitration in accordance with the rules then obtaining of either the American Arbitration Association or the Board of Governors of the New York Stock Exchange as I may elect. If I do not make such election by registered mail addressed to you at your main office within five days after demand by you that I make such election, then you may make such election. Notice preliminary to, in conjunction with, or incident to such arbitration proceeding, may be sent to me by mail and personal service is hereby waived. Judgment upon any award rendered by the arbitrators may be entered in any court having jurisdiction thereof, without notice to me.

This agreement with Bache bears defendant Shaughnessy's signature in the space designated "Customer's Signature." On 5 October 1979, Shaughnessy entered into a "Partnership Account Agreement" with Bache. That agreement provided, in part, as follows:

> We, the undersigned, request you to open a partnership account in the name of Capital City Investments a duly organized partnership, of which each of us is a general partner, and of which the undersigned are the sole partners. We jointly and severally authorize and instruct you to accept from any one of us (each of us being fully authorized to act alone) any and all orders upon said account, and to act thereon, including (but, not exclusively) any and all orders for the purchase, for cash and/or on margin, of securities and/or commodities, for the sale of securities and/or commodities, for the payment of money, including payments to the person giving the order, or any other action with respect thereto.

The words "Capital City Investments" were written by hand. Defendant Shaughnessy's signature appears at the bottom of this document. Underneath his signature is the handwritten notation, "Managing Partner; Capital City Investments."

Although there is no written agreement in the record, plaintiffs allege in their complaint that defendant Shaughnessy opened a customer account sometime in March of 1981 with defendant Wheat, purportedly on behalf of CCI. That agreement contained no arbitration provision.

None of the customer agreements bears any signature other than that of defendant Shaughnessy.

On 9 July 1982, plaintiffs filed the complaint in this matter alleging basically that, between October 1981 and April 1982, defendant Shaughnessy, along with the individual defendants in their capacities as securities dealers for the corporate defendants, engaged in a series of securities transactions that resulted in the loss of approximately 95% of the money that plaintiffs had invested with CCI. The total amount of money invested by plaintiffs with CCI exceeded $500,000.00. The complaint further alleged that the loss was occasioned through "the unlawful conspiracy, fraud, false pretense, deceit, breach of fiduciary

duties, breach of contract, gross negligence and reckless conduct" of each defendant, including Shaughnessy. The original complaint contains fourteen counts and eleven claims for relief setting forth in detail the allegations regarding each defendant.

On 21 September 1982, after a stipulated extension of time within which to file responsive pleadings, the Merrill Lynch defendants filed a motion with the Superior Court to stay its proceedings pending arbitration of the dispute or, alternatively, to dismiss plaintiffs' complaint for failure to state a claim for relief. Merrill Lynch also made a demand for arbitration. On 23 September 1982, the Bache defendants moved to stay the judicial proceedings, alleging that they had elected arbitration pursuant to the terms of the customer agreement. The Bache defendants moved at the same time to dismiss the complaint.

In support of these motions, Merrill Lynch and Bache relied on the arbitration provisions in their respective customer agreements and on the CCI partnership agreement. They also cited certain provisions of state and federal law that require the enforcement of agreements to arbitrate.

The Wheat defendants also moved on 21 September 1982 to stay the proceeding in Superior Court pending a ruling on the motions of Bache and Merrill Lynch regarding arbitration. Although the Wheat defendants were not able to rely on a written arbitration provision, they cited judicial economy in support of their motion.

The plaintiffs responded to the defendants' motions by alleging, *inter alia*, that the Limited Partnership Agreement and the customer agreements on which the defendants relied were not valid as to plaintiffs. Plaintiffs also alleged that the motion of the Wheat defendants was not based on any supposed right of arbitration. Plaintiffs requested that the court stay any arbitration proceedings. Specifically, plaintiffs sought to avoid electing an arbitration forum until the court had ruled on the defendants' motions, in effect determining the validity of the arbitration provisions.

By various orders and rulings of court, all matters regarding arbitration were stayed pending the court's ruling on the motions. Plaintiffs amended their complaint to include an allegation that

defendants violated certain provisions of the federal Securities Act of 1933 (Act of 27 May 1933, 48 Stat. 74).

The hearing on the motions was held at the 8 November 1982 Session of Wake County Superior Court before Farmer, Judge. The court considered the plaintiffs' complaint—no answer having been filed, the motions of the defendants, the "Limited Partnership Agreement of Capital City Investments" signed by defendant Shaughnessy, copies of the customer agreements with Merrill Lynch and Bache, the Partnership Account Agreement with Bache, affidavits of defendants Grove and Walterman regarding the nature of the relationship between defendants Bache and Merrill Lynch and CCI, and affidavits by plaintiffs stating that they were unaware of the customer agreements and the arbitration provisions. On 3 December 1982, Judge Farmer entered an order denying defendants' motions to stay judicial proceedings and directing defendants to file a responsive pleading within 10 days. The court also refused to dismiss the action.

In the portion of the order denying the defendants' motions to stay, the court found the following pertinent facts:

1. That one of the documents presented by defendants in support of their motions recites that it is a limited partnership agreement creating a limited partnership pursuant to the Uniform Limited Partnership Act and the Uniform Partnership Act of North Carolina.

2. That such partnership document is not executed or signed by any of the plaintiffs. However, from the pleadings, it is evident that plaintiffs did become investors with Capital City Investments by placing monies with defendant Jeffrey John Shaughnessy.

3. That on August 10, 1979, defendant Shaughnessy executed a printed customer agreement form with defendant Merrill Lynch, the signatory page thereof containing the handwritten notation "Capital City Investments," the signature of Shaughnessy and, immediately thereafter, the printed words "a partner."

4. That on August 23, 1979, defendant Shaughnessy signed a printed customer form with defendant Bache, neither the said form nor the signature indicating in any way

that a partnership was involved or that Shaughnessy was executing the same in any capacity other than that of an individual.

5. That on October 5, 1979, defendant Shaughnessy signed a printed Bache form designated as "Partnership Account Agreement." This form indicated that Capital City Investments was a general partnership and the said form obviously contemplates that it is to be signed by all general partners. Defendant Shaughnessy signed the agreement form as "Managing Partner, Capital City Investments."

6. That there is no evidence that any of plaintiffs executed any of the documents introduced into evidence by defendants.

7. That none of plaintiffs was aware of the "customer agreement" forms signed by defendant Shaughnessy until defendants Merrill Lynch and Bache produced such forms and attached them to their motions for stay of proceedings.

8. That the document entitled "Limited Partnership Agreement" relied upon by defendants Bache and Merrill Lynch recites that the Limited Partners shall have no power to manage or control the affairs of Capital City Investments. Further, there is no evidence that any plaintiff was involved in the management of Capital City Investments or was familiar with defendant Shaughnessy's handling of Capital City Investment's affairs.

9. That the customer agreement forms signed by defendant Shaughnessy with defendants Merrill Lynch and Bache both contain paragraphs agreeing to submit any controversy "between us" or "arising out of or relating to my account" to arbitration.

From these facts, the court drew the following pertinent conclusions:

2. That defendants Bache and Merrill Lynch have the burden of proof on the issue of whether there was a valid agreement binding plaintiffs to arbitration of the causes of action set forth in plaintiffs' complaint as amended.

3. That defendants Merrill Lynch and Bache have failed to present to the Court any evidence demonstrating that defendant Shaughnessy had any authority, actual or apparent, to bind plaintiffs to any agreement to submit controversies with any of defendants to arbitration, and accordingly did not meet their burden of proof.

4. That the Court notes that G.S. 59-39(e)[1] specifically precludes a single partner from entering into an agreement to submit partnership claims to arbitration absent actual authority to do so.

5. That defendants have not shown, nor can the Court conclude from the evidence, that plaintiffs had knowledge of the customer agreements containing arbitration clauses, nor is there any evidence of ratification of such agreements by plaintiffs, ratification not being possible where the plaintiffs had no knowledge of the unauthorized act of defendant Shaughnessy in entering into customer agreements containing the subject arbitration clauses.

Other conclusions of law relate to plaintiffs' claims for relief under state and federal securities laws. Because we do not reach defendants' exceptions and assignments of error relating to those conclusions, we perceive no need to repeat them here. Likewise, because defendants have apparently abandoned their assignment of error relating to the court's denial of their motions to dismiss, we perceive no need to set forth the findings and conclusions relating thereto.

On 7 December 1982, defendants moved for reconsideration of the 3 December 1982 orders offering as evidence in support of their motions the purchase agreements and subscription agreements executed between plaintiffs and defendant Shaughnessy and referred to previously. The motions were denied and defendants thereafter gave written notice of appeal from the 3 December 1982 orders.

---

1. The following stipulation appears on page 4 of the record:

12. Paragraph 4 of the conclusions of law in the order of Judge Farmer dated December 3, 1982, and designated as Order Denying Stay of Proceedings, contains an apparent error in the statutory citation reference. Judge Farmer apparently intended to cite G.S. 59-39(c)(5) instead of G.S. 59-39(e). For the purposes of this appeal, it is agreed that Judge Farmer so intended.

*Harrell and Titus, by Bernard A. Harrell, and Akins, Mann, Pike and Mercer by J. Jerome Hartzell, for plaintiff appellees.*

*Hunton and Williams, by Odes L. Stroupe, Jr., James E. Farnam, and David Dreifus for defendant appellants Wheat, First Securities, Inc., Ownley and Folger.*

*Fleming, Robinson, Bradshaw and Hinton, by Richard A. Vinroot and John R. Wester, for defendant appellants Bache Halsey Stuart Shields, Inc., Walterman and Berry.*

*Rogers and Hardin, by Paul W. Stivers and Janice E. Garlitz, pro hac vice, and Manning, Fulton and Skinner, by Michael T. Medford, for defendant appellants Merrill Lynch, Pierce, Fenner and Smith, Inc., and Grove.*

*North Carolina Department of Justice, by Associate Attorney General Philip A. Telfer, and North Carolina Department of State, by Roland S. Jones, as amici curiae.*

*No appearance for defendant Shaughnessy.*

EAGLES, Judge.

The issue in this case is whether it was proper for the Superior Court to deny the defendants' motions to stay proceedings in the trial court pending arbitration of the matters raised in plaintiffs' complaint. We hold that it was.

I

The underlying suit here involves a group of investors, plaintiffs, who are suing the person to whom they allegedly entrusted their money, defendant Shaughnessy, along with three national stock brokerage firms and named individual securities dealers employed by those firms. The complaint alleges that defendant Shaughnessy and the individual securities dealers, using the money supplied by plaintiffs, engaged in a course of trading in securities that was highly speculative, reckless and in violation of the fiduciary duties owed by them to plaintiffs. The complaint further alleges that when the trades and investments so made began to lose money, the defendants conspired to misrepresent and to avoid disclosing to plaintiffs the full extent of their activities and the losses sustained. Plaintiffs contend that defendants' continued reckless trading without the knowledge or permission of plaintiffs resulted ultimately in the loss of over 95% of the funds invested

by plaintiffs, over $500,000.00. Plaintiffs claim that defendants' conduct was illegal and fraudulent and they seek actual and punitive damages amounting to over 15 million dollars.

a.

Defendants assert that the claims alleged in plaintiffs' complaint are properly the subject of arbitration. They filed motions seeking to stay judicial proceedings pending the arbitration of the dispute. The motions were denied and defendants have appealed.

Defendants' motions were made pursuant to G.S. 1-567.3 and 9 U.S.C. § 1 *et seq.* G.S. 1-567.3 provides, in pertinent part, as follows:

(a) On application of a party showing an agreement described in G.S. 1-567.2; and the opposing party's refusal to arbitrate, the court shall order the parties to proceed with arbitration, but if the opposing party denies the existence of the agreement to arbitrate, the court shall proceed summarily to the determination of the issue so raised and shall order arbitration if found for the moving party, otherwise, the application shall be denied.

Denial of an application to compel arbitration under this provision is an appealable interlocutory order. G.S. 1-567.18(a)(1). *See Sims v. Ritter Constr. Co.*, 62 N.C. App. 52, 302 S.E. 2d 293 (1983) (arbitration is a "substantial right"). *But see Peloquin Assocs. v. Polcaro*, 61 N.C. App. 345, 300 S.E. 2d 477 (1983) (order staying arbitration pending judicial determination of a collateral issue held non-appealable). Defendants' appeal therefore is not premature.

b.

We note at the outset that our courts have approved arbitration as a manner of settling disputes. This Court, in *Thomas v. Howard*, 51 N.C. App. 350, 276 S.E. 2d 743 (1981), noted that the intent of the legislature in enacting the Uniform Arbitration Act, G.S. Ch. 1, Art. 45A, was to encourage parties to submit disputed matters to arbitration when feasible and expedient. *See Sims v. Ritter Constr. Co., supra.* This policy of encouraging arbitration in appropriate cases is consistent with federal policy regarding arbitration. Federal law provides for the enforceability of agreements to arbitrate as follows:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. The effect of this particular provision was recently considered by the U.S. Supreme Court in the case of *Southland Corp. v. Keating*, 52 U.S.L.W. 4131 (opinion announced 23 January 1984). *Southland* was a case originating in California and involving a franchise agreement containing a provision regarding arbitration. That provision is similar to the provisions involved in this case. It provided as follows:

> Any controversy or claim arising out of or relating to this Agreement or the breach thereof shall be settled by arbitration in accordance with the rules of the American Arbitration Association . . . and judgment upon any award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

*Id.* at 4132.

The plaintiffs in *Southland* had sued defendants for fraud, oral misrepresentation, breach of contract, breach of fiduciary duty and other violations of California's Franchise Investment Law. Plaintiffs relied on the following provision of the California Statutes:

> Any condition, stipulation or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of this law or any rule or order hereunder is void.

Cal. Corp. Code § 31512 (West 1977). The California Supreme Court held that, because of the quoted statute, the arbitration provision in the franchise agreement was void and that plaintiffs' claims were not subject to arbitration.

In an opinion by Chief Justice Burger, the Supreme Court reversed the California Supreme Court holding that the California

law violated the Supremacy Clause of the U.S. Constitution and that the Federal Arbitration Act preempts any state laws purporting to create non-arbitrable claims. The opinion notes that the legislative intent of the federal act was to encourage the non-judicial resolution of the claims of contracting parties and to dispel the traditional hostility toward arbitration inherited from English common law. *Southland* holds that § 2 of the federal act is a rule of substantive law intended to apply in state as well as federal courts.

In an earlier opinion, *Moses H. Cone Hospital v. Mercury Constr.*, --- U.S. ---, 74 L.Ed. 2d 765 (1983), the Court affirmed the reversal of a federal district court order staying arbitration under a provision in a construction contract. The Court there said that § 2 of the Federal Arbitration Act was a "congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary." *Id.* at ---, 74 L.Ed. 2d at 785. *See also Prima Paint Corp. v. Flood and Conklin Mfg. Corp.*, 388 U.S. 395 (1967) (Federal Arbitration Act applied to federal diversity jurisdiction cases).

c.

These cases should be compared with the earlier case of *Wilko v. Swan*, 346 U.S. 427 (1953). That case more closely resembles the case *sub judice* in that it involved an agreement to arbitrate between a securities brokerage firm and one of its customers. Regarding the federal policy and congressional intent behind the Federal Arbitration Act, *Wilko* makes essentially the same observations as *Southland* and *Moses Cone*. *Wilko*, however, involves neither a franchise agreement nor a construction contract. Rather, *Wilko* concerns securities dealing, a subject with respect to which the Court noted a strong countervailing federal policy underlying the Securities Act of 1933.

Designed to protect investors, the act requires issuers, underwriters, and dealers to make full and fair disclosure of the character of securities sold in interstate and foreign commerce and to prevent fraud in their sale. To effectuate this policy, § 12(2) created a special right to recover for misrepresentation which differs substantially from the common-law action . . . .

346 U.S. at 431. In concluding, the Court held:

> Two policies, not easily reconcilable, are involved in this case. Congress has afforded participants in transactions subject to its legislative power an opportunity generally to secure prompt, economical and adequate solution of controversies through arbitration if the parties are willing to accept less certainty of legally correct adjustment. On the other hand, it has enacted the Securities Act to protect the rights of investors and has forbidden a waiver of any of those rights. Recognizing the advantages that prior agreements for arbitration may provide for the solution of commercial controversies, we decide that the intention of Congress concerning the sale of securities is better carried out by holding invalid such an agreement for arbitration of issues arising under the Act.

### d.

We note also that the Securities Exchange Commission recently codified its policy, based on *Wilko v. Swan, supra,* of discouraging the use of arbitration provisions by brokerage firms in their customer agreements, particularly where individual customers are involved. Rule 15 c 2-2, 48 Fed. Reg. 53404 (1983) (to be codified at 17 C.F.R. § 240). Commenting on the continued inclusion of arbitration provisions by brokerage firms in their customer agreements, the Commission said,

> In light of the clearly contrary law in this area, such language is a misleading statement of customers' rights regarding federal securities laws. Because years of informal discussions have failed to correct this practice, the Commission has decided that it is appropriate to adopt this rule.

48 Fed. Reg. at 53404. The rule provides, in pertinent part:

> (a) it shall be a fraudulent, manipulative or deceptive act or practice for a broker or dealer to enter into an agreement with any public customer which purports to bind the customer to an arbitration of future disputes between them arising under the federal securities laws, or to have in effect such an agreement, pursuant to which it effects transactions with or for a customer.

48 Fed. Reg. at 53406-07. Although the effective date of this regulation is 28 December 1983 and its application to this case therefore uncertain, it is apparent that the rule is meant to reflect and clarify the S.E.C.'s interpretation of existing law.

The question before us concerns a relatively narrow point of pre-trial procedure, i.e.: whether the state court action must be stayed pending arbitration. However, we cannot ignore the fact that this procedural point is significantly intertwined, via the policy considerations previously discussed, with the substantive merits of this case. For this reason, we are compelled to recognize the applicable federal law and underlying policy and note their relevance to the question before us.

## II

The essence of defendants' multifaceted argument is that the customer agreements, with their arbitration clauses executed by defendant Shaughnessy are valid as to plaintiffs and therefore binding on them. We have carefully considered defendants' argument, but are not persuaded by it.

### a.

Considerations of policy aside, we note that one common thread upon which the preceding authorities depend is the existence of a valid agreement. 9 U.S.C. § 2 provides for the validity and enforceability of agreements to arbitrate "save upon such grounds as exist at law or in equity for the revocation of any contract." *Southland, supra,* in holding this provision to be substantive and preemptive federal law, presupposed that its application would be limited to agreements that were otherwise valid and binding on the parties. However, rather than simply presuming the validity of an arbitration provision from the validity of the underlying agreement, the Court seemed to require some showing that the agreement to arbitrate, whether a separate agreement or a provision of the same agreement, " 'was made in an arm's-length negotiation by experienced and sophisticated businessmen.'" *Southland Corp. v. Keating, supra* at 4133, *quoting The Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 12 (1972). This apparent requirement for independent negotiation underscores the importance of such a provision and militates against its inclusion in contracts of adhesion. This reading of *Southland* is consistent with the federal policy of discouraging arbitration of securities claims.

9 U.S.C. § 3, the federal provision upon which defendants relied in seeking to stay the court proceedings, provides as follows:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

This provision, like § 2, requires a written agreement. The application of 9 U.S.C. § 2 would require that the agreement meet certain other indicia of validity as well. *Southland*, while holding § 2 to be substantive, held that § 3 was procedural. *Southland Corp. v. Keating, supra* at 4135, fn 10. When not in substantive conflict, state law controls questions of procedure. *See generally*, Wright, Miller, Cooper and Gressman, 16 Federal Practice and Procedure § 4023 (1977). Thus, defendants' motion was properly made and considered under the applicable provision of our law, G.S. 1-567.3(a), set forth above.

### b.

Under our law, as under the federal law, the very crux of the court's inquiry is whether a valid agreement exists such that the controversies between the parties may be subjected to arbitration. Additionally, *Southland* requires that our courts consider the additional indicia of validity that attach to the substantive application of 9 U.S.C. § 2, including but not limited to, whether the arbitration provision was the subject of independent negotiation.

G.S. 1-567.3(a) provides that where a party denied the existence of an arbitration agreement, "the court shall proceed summarily to the determination of the issue so raised and shall order arbitration if found for the moving party." In the present case, the defendants, as the moving parties, had the burden of establishing the existence of an agreement to arbitrate. Whether defendants met their burden was a matter for the court's deter-

mination. *See In re Boyte*, 62 N.C. App. 682, 303 S.E. 2d 418, *disc. rev. denied*, 309 N.C. 461, 307 S.E. 2d 362 (1983) (G.S. 1-567.3 provides means for a party to seek court determination of whether an agreement to arbitrate exists); *Development Co. v. Arbitration Assoc.*, 48 N.C. App. 548, 269 S.E. 2d 685 (1980), *disc. rev. denied*, 301 N.C. 719, 274 S.E. 2d 227 (1981) (court's inquiry under G.S. 1-567.3 not limited to question of whether agreement to arbitrate exists). The trial court here was sitting as the trier of fact. Its findings are therefore binding on this Court unless there was no competent evidence to support them. *Henderson County v. Osteen*, 297 N.C. 113, 254 S.E. 2d 160 (1979).

### III

Defendants except to and assign as error several of the findings of fact on the grounds that they are not supported by the evidence. Defendants also except to the entry of the judgment as well as to specific conclusions of law on the grounds that they are not supported by the findings of fact. Thus, the question presented for our consideration is whether the findings are supported by the evidence and whether they, in turn, support the conclusions of law and the judgment based thereon. For the reasons stated below, we affirm the order of the trial court.

### a.

The defendants concede that no certificate of limited partnership was filed with the Wake County Register of Deeds. G.S. 59-2, governing the formation of limited partnerships, provides in pertinent part:

(a) Two or more persons desiring to form a limited partnership shall

(1) Sign and swear to a certificate . . . .

(2) File for record the certificate in the office of the register of deeds of the county where the principal place of business is located according to the statement in such certificate.

(b) A limited partnership is formed if there has been substantial compliance in good faith with the requirements of subsection (a).

It is generally held that a failure to file a certificate of limited partnership is a failure of "substantial compliance" such that any assertion of limited partnership is negated. *E.g., Bisno v. Hyde,* 290 F. 2d 560 (9th Cir. 1961), *cert. denied,* 368 U.S. 959 (1962); *Tiburon Nat'l Bank v. Wagner,* 265 Cal. App. 868, 71 Cal. Rptr. 832 (1968). *See generally,* Hamilton, Corporations 6 (1976). *But see Johnson v. Manning,* 63 N.C. App. 673, 306 S.E. 2d 137 (1983) (failure to file certificate of limited partnership does not affect relationship of parties *inter se* where evidence shows intent to operate as a limited partnership). Here, not only has no certificate ever been filed, but there is nothing in the record that suggests that the required certificate was ever prepared. Thus, notwithstanding the existence of a Limited Partnership Agreement, the purchase or subscription agreements, and the recitations in the other documents in evidence, it is our view and we hold that no limited partnership existed here. Though findings to this specific effect were not made by the court, the evidence nevertheless compels them and they are implicit in the findings of ultimate fact that were made. To the extent that the trial court made those findings, we hold that they were correct.

### b.

Defendants contend that there was nevertheless some relationship between plaintiffs and defendant Shaughnessy. Defendants argue that the relationship was that of a general partnership. Defendants rely on the theory that a general partnership is formed by operation of law where, as here, there has not been substantial compliance with the statutory requirements for the formation of a limited partnership. *See Atlanta Stove Works, Inc. v. Keel,* 255 N.C. 421, 121 S.E. 2d 607 (1961). The usual situation in which the law implies a general partnership is that in which a party is claiming limited partnership status in order to avoid the greater liability that attaches to status as a general partner or where the evidence shows that the parties intended the existence of a partnership for some agreed upon function. G.S. 59-37 establishes guidelines for determining the existence of a partnership in such situations. The cases cited by defendants, *Heritage Hills v. Zion's First National Bank,* 601 F. 2d 1023 (9th Cir. 1979); *Bisno v. Hyde, supra; Ruth v. Crane,* 392 F. Supp. 724 (E.D. Pa. 1975), *aff'd per curiam,* 564 F. 2d 90 (3d Cir.

1977), are examples of typical cases where the law implies a general partnership.

Our research discloses, however, that a *de facto* general partnership is not the necessary result of a failure to comply with the statutory requirements of limited partnership formation. G.S. 59-11 provides as follows:

> A person who has contributed to the capital of a business conducted by a person or partnership erroneously believing that he has become a limited partner in a limited partnership, is not, by reason of his exercise of the rights of a limited partner, a general partner with the person or in the partnership carrying on the business, or bound by the obligations of such person or partnership; provided that on ascertaining the mistake he promptly renounces his interest in the profits of the business, or other compensation by way of income.

The U.S. Supreme Court, in the case of *Giles v. Vette*, 263 U.S. 553 (1924), observed that the Uniform Limited Partnership Act (hereinafter ULPA) was enacted in part to relax the strict rule of law that a general partnership existed in all cases where a purported limited partnership failed to comply with the applicable statute.

> Section 11 [of the ULPA] is broad and highly remedial. The existence of a partnership—limited or general—is not essential in order that it shall apply. The language is comprehensive and covers all cases where one has contributed to the capital of a business conducted by a partnership or person, erroneously believing that he is a limited partner. It ought to be construed liberally, and with appropriate regard for the legislative purpose to relieve from the strictness of the earlier statutes and decisions.

*Id.* at 563. *See also, U.S. v. Coson*, 286 F. 2d 453 (9th Cir. 1961) (renunciation under § 11 of ULPA accompanied by lack of intent to join a general partnership); *Voudouris v. Walter E. Heller & Co.*, 560 S.W. 2d 202 (Tex. Civ. App. 1977) (no resulting general partnership where intent was only to join a limited partnership). *But see Laney v. Commissioner of Internal Revenue*, 674 F. 2d 342 (5th Cir. 1982) (substantial compliance test satisfied where

only thing lacking is filed certificate of limited partnership). *See generally* Coleman and Weatherbie, Special Problems in Limited Partnership Planning, 30 S.W. L. J. 887 (1976). Thus, where a limited partnership is found not to exist, it is the intent of the parties and not the operation of law, as defendants contend, that determines whether or not a general partnership results. *See Johnson v. Manning, supra.* While the situation here is not one that is obviously contemplated by G.S. 59-11, the status of plaintiffs relative to defendant Shaughnessy is nevertheless important to the resolution of this case and the same principles ought to apply.

The evidence in this case, including the evidence submitted with defendants' motions for reconsideration, discloses that some of the plaintiffs signed agreements with Shaughnessy referring to a limited partnership agreement while others signed agreements referring to a partnership agreement. While a limited partnership agreement did exist, there was no evidence that any of the plaintiffs ever signed it. No two plaintiffs, unless members of the same family, signed the same copy of the agreement. There are no documents relating to the formation of any partnership that are signed by more than one plaintiff, unless members of the same family.

The evidence further shows that CCI was established and promoted as a limited partnership with defendant Shaughnessy as the general partner. However, there is no evidence that any steps were ever taken to comply with G.S. 59-2, regarding limited partnership formation. Applying the principles set forth above to these facts, it is clear that, under G.S. 59-11, no partnership relationship would be formed. CCI had no income, so there was no interest in such income for plaintiffs to renounce, as called for under the statute. Further, there is no indication that any of the plaintiffs acted as principals or in any way behaved as other than the limited partners that they erroneously thought themselves to be. The nature of CCI's business was such that there was little opportunity for them to do so. The same evidence shows that there was no intention on the part of plaintiffs to continue in the operation of CCI as general partners. The court therefore correctly failed to make findings or conclusions to the effect that any partnership — general or limited — existed. Defendants' contentions that the evidence compelled such findings are without merit.

Defendants' argument, insofar as it assumes the existence of a partnership, is also without merit.

## IV

What remains of defendants' argument regarding defendant Shaughnessy's purported authority to bind plaintiffs to the customer agreements assumes that plaintiffs had knowledge of the customer agreements. Defendants contend that plaintiffs are equitably estopped from denying the validity of the arbitration provisions in the customer agreements because, by the present action, they are seeking to recover under the agreements as third party beneficiaries. On the same theory, defendants argue that plaintiffs have ratified defendant Shaughnessy's actions and that the customer agreements entered into by him are therefore valid and binding on plaintiffs. These arguments are without merit. There is no evidence anywhere in the record that would suggest that plaintiffs had any knowledge of the customer agreements. The affidavits submitted by plaintiffs in support of their motion indicate that they were not aware of the customer agreements until after the action was initiated. Plaintiffs' complaint relies on the relationship that arose and existed between them and defendants as a result of defendants' trading in the CCI account, allegedly mishandling plaintiffs' money; the customer agreements are not mentioned in the complaint. The court below drew conclusions to this effect and, for the reasons stated, we hold they are correct.

## V

The narrow question before the trial court was whether there was a valid agreement between plaintiffs and defendants such that plaintiffs were bound by the arbitration provisions therein. For the reasons stated, we believe that the trial court correctly answered that question in the negative. This alone is a sufficient basis for denying defendants' motion to stay judicial proceedings and it is on this basis that we affirm the order of the court below. The trial court made additional findings and conclusions to which defendants have excepted and assigned error. In light of our conclusion above, we find that the additional findings and conclusions made by the court and excepted to by defendants are unnecessary to support the order and we hold that they are surplusage. We therefore need not consider those exceptions and

---

---

assignments of error or the arguments advanced by defendants to support them.

The order of the trial court is

Affirmed.

Judges HEDRICK and HILL concur.