DONALD RAY ROUTH AND PENNY C. ROUTH, PLAINTIFFS-APPELLEES v.
SNAP-ON TOOLS CORPORATION, TRACE S. DENGLER, III, INDIVIDUAL-
LY AND AS A BRANCH MANAGER OF SNAP-ON TOOLS CORPORATION; MARK
TROMBLEY, INDIVIDUALLY AND AS A FIELD MANAGER OF SNAP-ON TOOLS COR-
PORATION; AND ED BONGE, JR., INDIVIDUALLY AND AS A SALES MANAGER OF
SNAP-ON TOOLS CORPORATION, DEFENDANTS-APPELLANTS

No. 9121SC695

(Filed 15 December 1992)

Arbitration and Award § 2 (NCI4th) — termination agreement —
arbitration clause — no meeting of minds as to arbitration

Where a dealership termination agreement containing an
arbitration clause was not signed by plaintiff on the line
designated for his signature but was signed by him only below
an addition to the agreement whereby plaintiff agreed to repay
defendant corporation $1,000 per month until the balance he
owed was paid, an ambiguity existed as to whether plaintiff
agreed to all the terms in the termination agreement or merely
to those in the addition immediately preceding his signature,
and the trial court properly admitted extrinsic evidence to
explain this ambiguity. The evidence supported the trial court's
finding and conclusion that there was no valid agreement to
arbitrate where plaintiff's evidence showed that his only con-
cern on the date the agreement was signed was to arrive
at an agreement to pay the balance he owed defendant corpora-
tion, that no negotiations concerning arbitration ever occurred,
and that defendant's representatives never discussed or ex-
plained the arbitration clause.

Am Jur 2d, Arbitration and Award §§ 11, 12.

Appeal by defendants from order entered 30 April 1991 by
Judge W. Steven Allen in Forsyth County Superior Court. Heard
in the Court of Appeals 12 May 1992.

In this action, plaintiffs are seeking damages allegedly incurred
as a result of misrepresentations made by defendants arising out
of the employment relationship between plaintiff Donald Ray Routh
and defendant Snap-On Tools Corporation (Snap-On). In January
of 1986, Donald Routh (plaintiff) invested $52,500 with Snap-On
to become an independent Snap-On dealer. According to plaintiff,
he decided to become a Snap-On dealer based upon defendants'

## ROUTH v. SNAP-ON TOOLS CORP.

[108 N.C. App. 268 (1992)]

representations that he would earn in excess of $100,000 per year. After working for more than a year, plaintiff determined that he could not generate the income level as represented by defendants and on 19 October 1987, gave written notice that he was terminating his Snap-On dealership.

Shortly after plaintiff gave written notice, defendant Mark Trombley (a Snap-On Field Manager) called plaintiff and instructed him to come to Charlotte in order to turn in his tool inventory and settle accounts. On 9 November 1987, plaintiff met with defendant Trace Dengler (a Snap-On Branch Manager) in Charlotte and checked in his remaining tool inventory. At this meeting plaintiff signed three (3) documents entitled "Financial Settlement," "Dealer Termination Statement, Assignments and Creditors" and "Extended Credit Listing for Terminating Dealers." At some point in time, plaintiff also signed the back of a "standard form" document entitled "Termination Agreement" which this controversy now pertains to.

According to plaintiff, in this agreement matters of damaged inventory and the balance owed Snap-On of $5,900 were settled with plaintiff agreeing to pay this amount at the rate of $1,000 per month. These terms were added to the back of the Termination Agreement. The Termination Agreement provides in pertinent part:

### TERMINATION AGREEMENT

. . . .

2. The Dealer agrees to pay, within (see back) from the date of this Agreement, the difference between the outstanding balance due to the Company and the credit provided by paragraph 1 of this Agreement for the repurchase of inventory. The Dealer must deliver the remaining inventory, by the date specified in paragraph 1. The Dealer agrees that the Company may deduct the balance due it from the inventory credit to satisfy this provision.

. . . .

6. This Agreement extends to all agents, heirs, employees and officers of either party to this Agreement. It is effective as of the above date and it supersedes any and all prior agreements, which are now cancelled. If any dispute arises over the terms of this Agreement, the parties will submit

to final and binding arbitration as the sole method of resolving the controversy. The request for arbitration must be filed in writing within one (1) year of the above date or all claims, known or unknown, are forever waived. The rules of the American Arbitration Association shall apply, and the terms of this Agreement shall govern. The prevailing party shall be awarded reasonable costs and fees.

7. Except as above, both parties to this Agreement freely waive any and all claims they may have against each other arising out of the Dealership terminated by this Agreement.

SNAP-ON TOOLS CORPORATION

By _____          By _____S/T.S. Dengler_____

(Dealer)                                    (Branch Manager)

. . . .

I, Donald Routh, agree to pay balance owed Snap-On Tools at approm. $1,000.00 a month until paid.

_____S/Donald R. Routh_____

On 7 March 1989, plaintiffs filed the present action against defendants. Plaintiffs' complaint is based upon theories of fraud, unfair and deceptive trade practices, negligent misrepresentation, intentional and negligent infliction of emotional distress, breach of contract, breach of implied covenant of good faith and fair dealing, and loss of consortium. In their answer, defendants denied these allegations and asserted several affirmative defenses which include the following: (1) the Termination Agreement by its terms releases all claims arising out of the dealership; and (2) plaintiffs' action is barred since they failed to request arbitration within one year as required by the Termination Agreement. After initial discovery was conducted, defendants filed a Motion for Judgment on the Pleadings and an alternative Motion to Compel Arbitration based upon the Termination Agreement.

On 19 February 1990, the trial court entered an order denying both of defendants' motions. However, in its order the trial court failed to summarily determine whether, as a matter of law, a valid arbitration agreement exists. Because of this omission in the 19 February 1990 order, this Court on appeal reversed the trial court and remanded the case with instructions for the trial court to

determine whether a valid arbitration agreement exists. *Routh v. Snap-On Tools Corp.*, 101 N.C.App. 703, 400 S.E.2d 755 (1991).

On 29 April 1991, the trial court held a hearing where it considered the Termination Agreement, the pleadings, briefs and the affidavits of both plaintiffs and entered an order denying defendants' Motion to Compel Arbitration. The trial court concluded as a matter of law that:

> Plaintiff Don Routh and the Defendants did not have a meeting of the minds regarding any agreement to arbitrate claims or controversies that arose out of Don Routh's Snap-On Tools dealership. The Termination Agreement which Defendants contend contains an arbitration agreement between the parties of this lawsuit was never executed and is therefore invalid and unenforceable.

*Blanchard, Twiggs, Abrams & Strickland, P.A., by Donald R. Strickland and Howard F. Twiggs, for plaintiff appellees.*

*Petree Stockton & Robinson, by Rodrick J. Enns, Thomas E. Graham and Denise M. Jennings, for defendant appellants.*

WALKER, Judge.

In this appeal, defendants question the validity of the trial court's order which concluded there was no agreement to arbitrate. According to defendants, their motion to arbitrate should have been granted since plaintiff Donald Routh's signature appears on page two (2) of the Termination Agreement wherein there is contained an agreement to arbitrate all controversies. Furthermore, defendants contend that plaintiffs cannot now maintain an action (by arbitration or otherwise) since plaintiffs failed to comply with the one year limitations period contained in paragraph six (6) of the Termination Agreement.

Initially, we note that public policy favors settling disputes by means of arbitration. *Prime South Homes, Inc. v. Byrd*, 102 N.C.App. 255, 401 S.E.2d 822 (1991). However, before a dispute can be settled in this manner, there must first exist a valid agreement to arbitrate. G.S. § 1-567.2. The law of contracts governs the issue of whether there exists an agreement to arbitrate. *Southern Spindle and Flyer Co., Inc. v. Milliken & Co.*, 53 N.C.App. 785, 281 S.E.2d 734 (1981), *disc. review denied*, 304 N.C. 729, 288 S.E.2d 381 (1982). Accordingly, the party seeking arbitration must show

that the parties mutually agreed to arbitrate their disputes. *Id.* This Court has even suggested that an agreement to arbitrate, if contained in a contract covering other topics, must be independently negotiated. *Blow v. Shaughnessy*, 68 N.C.App. 1, 16, 313 S.E.2d 868, 876-877, *disc. review denied*, 311 N.C. 751, 321 S.E.2d 127 (1984). This apparent requirement for independent negotiation underscores the importance of an arbitration provision and "militates against its inclusion in contracts of adhesion." *Id.* at 16, 313 S.E.2d at 877.

In the case at bar, the trial court's conclusion that the arbitration agreement was unenforceable was based upon its finding of fact that:

(12) At the time Don Routh signed the agreement agreeing to repay Snap-On One Thousand ($1,000.00) Dollars a month until his balance was paid, he did not realize he was signing a Termination Agreement that contained an arbitration provision and Plaintiff Don Routh had no intention to be bound by the terms of the Termination Agreement.

Findings of fact made by the trial court in a non-jury trial have the force and effect of a jury verdict and are conclusive on appeal if there is competent evidence to support them, although the evidence might have supported findings to the contrary. *Henderson County v. Osteen*, 297 N.C. 113, 254 S.E.2d 160 (1979). Accordingly, in reviewing the decision of the trial court, we must determine whether there is evidence in the record which supports the trial court's findings of fact and if so, whether these findings of fact in turn support the conclusion that there was no agreement to arbitrate. *Prime South Homes, Inc. v. Byrd, supra.*

The trial court considered plaintiff Don Routh's 23 April 1991 affidavit which was filed four days before reargument of the motion to compel arbitration. On appeal, defendants contend this document should not have been admitted into evidence since it contradicted plaintiff's earlier deposition. After reviewing the evidence, we find no merit in defendants' argument. Plaintiff's affidavit only conflicted with his prior deposition in regards to the date in November 1987 when the Termination Agreement was signed. In his affidavit and deposition, plaintiff maintains that defendants did not review the Termination Agreement with him, that he never read this document, and that the only reason he signed the document was to acknowledge he owed Snap-On $5,900. We further note from

**ROUTH v. SNAP-ON TOOLS CORP.**

[108 N.C. App. 268 (1992)]

the record that defendants failed to object to plaintiff's affidavit being received into evidence. Where no objection or exception is made at trial to the introduction of evidence, the appellant may not challenge the item on appeal. Rule 10(b)(1), N.C. Rules of Appellate Procedure; *Catoe v. Helms Construction & Concrete Co.,* 91 N.C.App. 492, 372 S.E.2d 331 (1988).

We now turn to the primary issue in this case which is whether the trial court properly concluded as a matter of law that plaintiff and defendants did not have a meeting of the minds regarding an agreement to arbitrate and thus no enforceable agreement.

Before a valid contract can exist, there must be mutual agreement between the parties as to the terms of the contract. *Normile v. Miller and Segal v. Miller,* 313 N.C. 98, 326 S.E.2d 11 (1985). Where there is no mutual agreement, there is no contract. If a question arises concerning a party's assent to a written instrument, the court must first examine the written instrument to ascertain the intention of the parties. *See Corbin v. Langdon,* 23 N.C.App. 21, 208 S.E.2d 251 (1974). When the language of the contract is clear and unambiguous, the court must interpret the contract as written. *Robbins v. C. W. Meyers Trading Post, Inc.,* 253 N.C. 474, 117 S.E.2d 438 (1960). However, where an agreement is ambiguous, interpretation of the contract is a question for the fact-finder to resolve, *Thompson-Arthur Paving Co. v. Lincoln Battleground Associates, Ltd.,* 95 N.C.App. 270, 382 S.E.2d 817 (1989), and parol or extrinsic evidence is admissible to explain or qualify the written instrument. *Root v. Allstate Insurance Co.,* 272 N.C. 580, 158 S.E.2d 829 (1968).

As previously noted, plaintiff's signature appears only after the language added to the Termination Agreement and not on the line designated for his signature. Both parties agree that the sentence immediately preceding plaintiff's signature is an addition to the original standard Termination Agreement. Since plaintiff signed below only the added language whereby he agreed to repay Snap-On $1000 per month and not on the applicable signature line, an ambiguity results as to whether plaintiff agreed to all the terms contained in the Termination Agreement or merely those terms in the added sentence immediately preceding his signature. Since this instrument is susceptible to more than one meaning, the trial court properly admitted extrinsic evidence to explain this ambiguity. *Root v. Allstate Insurance Co., supra.*

ROUTH v. SNAP-ON TOOLS CORP.

[108 N.C. App. 268 (1992)]

Upon reviewing the evidence it becomes apparent that plaintiff Donald Routh's only concern on the date the agreement was signed was to arrive at an agreement to pay the balance he owed Snap-On. According to plaintiff, no negotiations regarding arbitration ever took place and "[b]y signing this document the only agreement I was entering into with Snap-On was to pay them One Thousand ($1,000.00) Dollars a month until I paid off the Fifty-nine Hundred ($5,900.00) Dollars Snap-On claimed I owed them." According to plaintiffs' evidence, defendant Dengler never discussed arbitration or the waiver or release of any legal claims. In *Blow v. Shaughnessy*, 68 N.C.App. 1, 313 S.E.2d 868, *disc. review denied*, 311 N.C. 751, 321 S.E.2d 127 (1984), it was noted:

> [R]ather than simply presuming the validity of an arbitration provision from the validity of the underlying agreement, the Court seemed to require some showing that the agreement to arbitrate, whether a separate agreement or a provision of the same agreement, . . . was made in an arm's-length negotiation by experienced and sophisticated businessmen. . . . This apparent requirement for independent negotiation underscores the importance of such a provision and militates against its inclusion in contracts of adhesion.

*Id.* at 16, 313 S.E.2d at 876-877.

Although not necessary to our decision today, we also note that an arbitration clause, such as the one at issue in the present case, is ordinarily negotiated at the outset of a contractual relationship in an "arms-length negotiation." The fact that an arbitration agreement was attempted in a contract of adhesion at the close of the relationship further indicates a lack of mutuality of interest between these parties.

Whether defendants met their burden of establishing an agreement to arbitrate was a matter for the trial court's determination. The trial court's findings of fact are binding upon this Court unless there was no competent evidence to support them. *Blow v. Shaughnessy, supra.* Here, the evidence supports the trial court's findings and conclusion that the Termination Agreement was invalid and unenforceable.

Affirmed.

Judges LEWIS and WYNN concur.