**D. Joseph LONG, Individually and Derivatively as a Shareholder of Regency Home Fashions, Inc., Plaintiff,**

v.

**Louis L. SILVER, Individually and in his Fiduciary Capacity as a Shareholder of Regency Home Fashions, Inc.; Louis L. Silver as Trustee of the Express Trust of the Louis L. Silver Living Trust; All Unknown Beneficiaries of the Louis L. Silver Living Trust; Ronald Grossman, Individually and in his Fiduciary Capacity as an Officer and Shareholder of Regency Home Fashions, Inc.; Kevin Creegan, Individually and in his Fiduciary Capacity as an Officer and Shareholder of Regency Home Fashions, Inc.; Regency Home Fashions, Inc.; and Hertz Herson & Company, LLP, Certified Public Accountants, Defendants.**

No. 5:00CV22–H.

United States District Court,
W.D. North Carolina,
Statesville Division.

April 28, 2000.

Thomas C. Morphis, Tate, Young, Morphis, Bach & Farthing, Hickory, NC, Paul E. Culpepper, Tate Young Morphis Bach & Taylor LLP, Hickory, NC, for D. Joseph Long.

James R. Fox, Alan M. Ruley, Bell, Davis & Pitt, P.A., Winston–Salem, NC, for Louis L. Silver, All Unknown Beneficiaries of the Louis L. Silver Living Trust, Ronald Grossman, Kevin Creegan, Regency Home Fashions, Inc.

F. Lane Williamson, Womble, Carlyle, Sandridge & Rice, Charlotte, NC, James R. Fox, Alan M. Ruley, Bell, Davis & Pitt, P.A., Winston–Salem, NC, for Hertz, Herson & Co., LLP.

## MEMORANDUM AND ORDER

HORN, Chief United States Magistrate Judge.

**THIS MATTER** is before the Court on the following motions and memoranda:

1. "Defendants Louis L. Silver, Ronald Grossman, Kevin Creegan, and Regency Home Fashions, Inc.'s Motion to Compel Arbitration and Stay Litigation" filed March 2, 2000 (document # 5);

2. "Defendants Louis L. Silver, Ronald Grossman, Kevin Creegan, and Regency Home Fashions, Inc.'s Brief in Support ..." filed March 2, 2000 (document # 6);

3. "Motion of Defendant Hertz, Herson & Company, to Dismiss for Lack of Personal Jurisdiction, or, in the Alternative, for a More Definite Statement and Stay of Proceedings" filed March 2, 2000 (document # 7);

4. "Plaintiff's Brief in Opposition to Motion to Compel Arbitration and Stay Litigation" filed March 30, 2000 (document # 15);

5. "Plaintiff's Brief in Opposition to Hertz Herson's Motion to Dismiss ..." filed April 3, 2000 (document # 16);

6. Plaintiff's "Affidavit of D. Joseph Long" filed April 3, 2000 (document # 17);

7. "Defendants' Reply Brief in Support of Motion to Compel ..." filed April 10, 2000 (document # 18); and

8. "Reply Memorandum in Support of Motion of Defendant Hertz Herson ..." filed April 17, 2000 (document # 19).

The parties have consented to Magistrate Judge jurisdiction under 28 U.S.C. § 636(c), and these motions are now ripe for the Court's determination.

Having carefully considered the parties' arguments, the record, and the applicable authority, the undersigned will *deny* both "Defendants Louis L. Silver, Ronald

Grossman, Kevin Creegan, and Regency Home Fashions, Inc.'s Motion to Compel Arbitration and Stay Litigation" and the "Motion of Defendant Hertz, Herson & Company, to Dismiss for Lack of Personal Jurisdiction, or, in the Alternative, for a More Definite Statement and Stay of Proceedings."

## I. *FACTUAL AND PROCEDURAL BACKGROUND*

Prior to August 1, 1972, Plaintiff D. Joseph Long ("Long") was an employee and 20% shareholder of Regency Bedspread Corporation ("Regency"), a North Carolina corporation with its primary manufacturing facility in Catawba County, North Carolina.

Prior to August 1, 1972, the Silver–Pilzer Company, Inc. ("Silver–Pilzer") owned 80% of Regency's outstanding shares. Defendant Louis Silver was Silver–Pilzer's principal shareholder and a chief executive officer.

On August 1, 1972, Plaintiff Long entered into a signed written agreement ("the 1972 agreement") with Silver–Pilzer, in which Long agreed to sell Silver–Pilzer his 20% ownership in Regency in exchange for 5% of the outstanding common stock in Silver–Pilzer plus $13,500, thus giving Silver–Pilzer 100% of Regency's outstanding voting stock. The 1972 agreement provided that Long's employment with Regency would continue as long as he owned the Silver–Pilzer shares.

In addition to providing for the purchase of Long's Regency shares and his continued employment, the 1972 agreement placed certain restrictions on Long's ability to sell his Silver–Pilzer shares; prohibited him from assigning his rights under the contract; provided a mechanism for valuing Long's shares; permitted Silver–Pilzer to carry life insurance on Long; and included the following arbitration clause:

> 6.1 Arbitration. Any and all disputes and controversies arising out of or in connection with this Agreement, or with respect to the construction and interpretation thereof, or concerning the rights of any one or more parties hereto against any one or more parties hereto, shall be determined by arbitration in accordance with and pursuant to the then existing rules of the American Arbitration Association.

The 1972 agreement makes no mention of Long's salary/compensation package—other than to state that they were to be determined later, Long's job responsibilities, or a method for evaluating Long's job performance. Nor does the 1972 agreement mention the other shareholders, address any other shareholder/partner issues, such as division of profits/losses or management/control of the corporation, or address the manner of dissolving the corporation.

The name of Regency Bedspread Corporation subsequently was changed to Regency Home Fashions, Inc., and Long's shares in Silver–Pilzer became shares in the new Regency entity.

The Plaintiff alleges that from 1972 to the time suit was filed, the Defendants engaged in conduct which was illegal and/or detrimental to Regency, and in intentional violation of the Plaintiff's rights as a shareholder. Specifically, the Plaintiff alleges:

(a) that the Defendants maintained and kept secret from the Plaintiff Regency's true financial records;

(b) that Defendant Louis Silver drew an annual salary of approximately $1,300,000.00 while doing no substantial work for Regency;

(c) that Defendant Louis Silver diverted monies from sales of Regency's inventory to his own personal use;

(d) that the Defendants acquired additional Regency stock which was improperly purchased with corporate assets;

(e) that Defendant Louis Silver paid many of his own personal bills through Regency; and

(f) that Defendant Louis Silver otherwise wrongfully diverted Regency assets to his own use.

Plaintiff alleges that he confronted Louis Silver in 1988 about his selling Regency inventory to third parties, including Resource Design, an entity solely owned by Silver. Plaintiff alleges that most of the proceeds from these sales of inventory were not recorded on the corporate books, but instead were paid directly to Silver at his direction and insistence. Additionally, Plaintiff alleges that Resource Design paid Regency only a fraction of the invoiced amount, and on certain occasions did not pay for the merchandise at all. Plaintiff alleges that Silver's scheme allowed him to drain Regency, illicitly and improperly, of more than $3,000,000.

On May 12, 1999, all Regency shareholders—Long, Louis Silver, the Louis L. Silver Living Trust, Ronald Grossman, and Kevin Creegan—signed a Shareholders Agreement ("the 1999 agreement"). The Plaintiff alleges that Defendants Silver and Grossman, then serving as Regency's CEO, prepared the 1999 agreement, which he characterizes as an attempt to cover-up past wrongdoing, and plainly told him to keep his job, he had to sign it. The Plaintiff also alleges that Defendant Grossman promised him if he signed, he would remain employed until he reached the age of 70, a promise which was memorialized in a May 13, 1999 letter from Grossman to Long.

Although broadly labeled a "Shareholders Agreement," the 1999 agreement was actually much narrower in focus, simply restricting the sale of stock and establishing a method for redemption of stock upon either termination of Regency employment or death. Similar to the 1972 agreement, the 1999 agreement contained an arbitration clause, which provided:

9(g) Governing Law; Arbitration. This agreement shall be construed and enforced in accordance with the laws of the state of New York applicable to contracts and agreements executed and to be performed wholly in New York. The parties hereby irrevocably and unconditionally agree that any dispute arising out of or relating to this Agreement or the breach, termination or validity thereof will be submitted by the parties to binding arbitration by a single arbitrator to take place in New York City under the rules other the American Arbitration Association then in effect. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof, with the attorneys fee and expenses of the prevailing party paid by the other party.

The 1999 agreement also provides that it "supercedes any and all prior agreements, whether written or oral, that pertains to its subject matter."

Six months after the 1999 agreement was executed, by letter dated November 29, 1999, Defendant Louis Silver terminated the Plaintiff's employment. Silver later demanded the Plaintiff surrender his stock in accordance with the 1999 agreement.

The Plaintiff alleges that principals with Defendant Hertz Herson & Company, LLP, Certified Public Accountants ("Hertz Herson"), were personally aware of the improper and/or illegal financial transactions involving Louis Silver and the other Defendants, yet continued to certify Regency's financial records and thereby allowed the violations to continue. Specifically, the Plaintiff alleges that Hertz Herson:

(a) Provided personal accounting services to Regency shareholders and officers while billing Regency for the work;

(b) Knowingly undervalued corporate inventory;

(c) Facilitated Defendant Louis L. Silver's illegal taking of cash and other corporate assets from Regency;

(d) Knowingly prepared false documents in connection with certified audits; and

(e) Knowingly prepared false tax returns.

Hertz Herson had performed accounting services for Regency since the early 1970's and its principals were well aware that most of the corporate assets and operations were located in North Carolina. The Plaintiff alleges that each year Hertz Herson sent four to six partners and employees to North Carolina to oversee inventory reviews, observe and certify Regency's books and ledgers, and to consult and perform other financial functions. Additionally, the Plaintiff alleges that Hertz Herson provided ongoing consulting services, oversaw the installation of a new computer system, recruited a company comptroller, and designed, implemented, and maintained cost control systems for Regency's North Carolina operation, as well as performing similar services for other clients in North Carolina.

The Plaintiff filed this lawsuit on January 19, 2000 in the Superior Court of Catawba County, alleging nine claims:

(1) frustration of reasonable expectation;

(2) breach of fiduciary duties;

(3) breach of contract;

(4) failure to distribute profits proportionately;

(5) fraud;

(6) civil conspiracy;

(7) unfair and deceptive trade practices;

(8) punitive damages; and

(9) a shareholders derivative action.

On February 4, 2000, Defendants removed the state action to this Court based on diversity jurisdiction. Removal appears to be proper and has not been challenged by the Plaintiff.

On March 2, 2000, Hertz Herson moved to dismiss based on a lack of personal jurisdiction, or in the alternative for a more definite statement and stay of proceedings, and the remaining Defendants moved to compel arbitration and stay litigation. These motions have been fully briefed and are now ripe for resolution.

## II. *DISCUSSION*

### A. *Motion to Compel Arbitration and Stay Litigation*

The Federal Arbitration Act ("FAA") establishes a federal policy favoring the enforcement of written agreements to arbitrate. Specifically, the FAA provides that arbitration clauses "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2 (1999). The FAA also requires courts to stay proceedings if the issues presented are covered by an arbitration agreement, and to compel arbitration in the event of a refusal to comply with a valid agreement to arbitrate. *See* 9 U.S.C. § 3 (1999).

On the other hand, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *see also AT & T Technologies, Inc. v. Communications Workers*, 475 U.S. 643, 648, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986); *Johnson v. Circuit City Stores, Inc.*, 148 F.3d 373, 377 (4th Cir.1998); *and Arrants v. Buck*, 130 F.3d 636, 640 (4th Cir.1997).

As Defendants correctly note, the Supreme Court has instructed that "questions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), *quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765, (1983). "Pursuant to that liberal policy, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like

defense to arbitrability." *Moses H. Cone,* 460 U.S. at 24–25, 103 S.Ct. 927. *See also O'Neil v. Hilton Head Hosp.,* 115 F.3d 272, 273–74 (4th Cir.1997).

However, as the Supreme Court has also instructed, the purpose of the FAA is not simply to promote the expeditious resolution of claims, but rather "to ensure judicial enforcement of privately made agreements to arbitrate." *Dean Witter Reynolds Inc. v. Byrd,* 470 U.S. 213, 219, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985). *See also Glass v. Kidder Peabody & Co., Inc.,* 114 F.3d 446, 452 (4th Cir.1997).

■ Therefore, the first duty of the district court when reviewing an arbitration proceeding under the FAA is to conduct a substantive arbitrability inquiry—meaning the court "engage[s] in a limited review to ensure that the dispute is arbitrable—i.e., that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement." *Glass,* 114 F.3d at 452, *citing PaineWebber, Inc. v. Hartmann,* 921 F.2d 507, 511 (3d Cir.1990).

■ In making this determination, the Court applies "ordinary state-law principles that govern the formation of contracts." *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995); *see also Arrants,* 130 F.3d at 640 ("Courts decide whether there is an agreement to arbitrate according to common law principles of contract law").

In applying the North Carolina Uniform Arbitration Act ("NCUAA"), N.C.Gen.Stat. § 1–567.2, the North Carolina Courts have also recognized a state policy favoring arbitration. *See Prime South Homes, Inc. v. Byrd,* 102 N.C.App. 255, 258, 401 S.E.2d 822, 825 (1991). However, before a particular dispute *must* be arbitrated, a valid agreement to arbitrate must exist *and* it must cover that particular dispute. *See Routh v. Snap–On Tools Corp.,* 108 N.C.App. 268, 271, 423 S.E.2d 791, 794 (1992); *and Southern Spindle and Flyer*

*Co., Inc. v. Milliken & Co.,* 53 N.C.App. 785, 786, 281 S.E.2d 734, 735 (1981), *disc. review denied,* 304 N.C. 729, 288 S.E.2d 381 (1982).

Plaintiff concedes that there were arbitration clauses in the agreements he signed, although he claims he was fraudulently induced into signing the 1999 agreement. *But see Prima Paint Corp. v. Flood & Conklin Manufacturing Co.,* 388 U.S. 395, 403–404, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967) (articulating when fraudulent inducement claims should themselves be submitted to arbitration, and when the courts may adjudicate).

Fortunately, however, the Court need not resolve the Plaintiff's fraudulent inducement claim to resolve the subject motions, because whether or not there was a valid arbitration clause, its scope clearly did not extend to the broad and diverse claims raised in this action. *See Glass,* 114 F.3d at 452.

The 1972 agreement was a simple stock purchase agreement, not the broader shareholder agreement urged by Defendants. The only parties to the agreement were Long and the now defunct Silver–Pilzer, and the scope of the agreement was not broad. Indeed, the 1972 agreement simply provided for the purchase of Long's Regency shares and his continued employment, placed restrictions on Long's ability to sell his Silver–Pilzer shares or assign rights under the contract, formulated a method for valuing Long's shares, and permitted Silver–Pilzer to carry life insurance on Long. It is a considerable stretch even to argue that this very narrow and limited agreement intended to cover or compel arbitration of the broad and diverse claims at issue in this lawsuit.

Nor was the 1999 agreement the all-inclusive agreement between the shareholders urged by the Defendants. To the contrary, much like the 1972 agreement, the 1999 agreement simply restricts each shareholder's right to sell stock, and establishes a method for redemption of the

shares upon either the termination of Regency employment or death.

In short, based on the plain language of both the 1972 and the 1999 agreements, the parties could not have possibly intended to bind themselves to arbitration of the claims raised in the instant Complaint. *See Glass,* 114 F.3d at 452; *Routh,* 108 N.C.App. at 271, 423 S.E.2d at 794; *and Blow v. Shaughnessy,* 68 N.C.App. 1, 16, 313 S.E.2d 868, 876–877, *disc. review denied,* 311 N.C. 751, 321 S.E.2d 127 (1984). *See also Armada Coal Export, Inc. v. Interbulk, Ltd.,* 726 F.2d 1566, 1568 (11th Cir.1984); *Necchi S. p. A. v. Necchi Sewing Machine Sales Corp.,* 348 F.2d 693, 698 (2d Cir.1965); *Hersman, Inc. v. Fleming Cos., Inc.,* 19 F.Supp.2d 1282, 1287 (M.D.Ala.1998), *aff'd,* 180 F.3d 271 (11th Cir.1999).

**B. *Motion to Dismiss for Lack of Personal Jurisdiction, Motion to Stay, and Motion for More Definite Statement***

A federal district court may exercise personal jurisdiction over a non-resident defendant in a diversity action only if courts of that state have personal jurisdiction over the defendant. *Omni Capital Int'l Ltd. v. Rudolf Wolff & Co.,* 484 U.S. 97, 104, 108 S.Ct. 404, 98 L.Ed.2d 415 (1987); *Ellicott Mach. Corp. v. John Holland Party, Ltd.,* 995 F.2d 474, 477 (4th Cir.1993).

When the court's exercise of personal jurisdiction is challenged under Federal Rule of Civil Procedure 12(b)(2), as here, "the plaintiff has the ultimate burden to prove the existence of jurisdiction by a preponderance of the evidence." *Mylan Labs., Inc. v. Akzo, N.V.,* 2 F.3d 56, 59–60

(4th Cir.1993); *Combs v. Bakker,* 886 F.2d 673, 676 (4th Cir.1989). The question of personal jurisdiction is evaluated under a two-step analysis, wherein the court first determines whether the state's long-arm statute confers jurisdiction; and second, the court must determine whether an exercise of jurisdiction complies with the federal constitutional standards of due process. *See Omni Capital Int'l Ltd.,* 484 U.S. at 102–03, 108 S.Ct. 404; *Ellicott Mach. Corp.,* 995 F.2d at 477; *Peanut Corp. of Am. v. Hollywood Brands, Inc.,* 696 F.2d 311, 313 (4th Cir.1982); *D.P. Riggins & Associates, Inc. v. American Board Companies, Inc.,* 796 F.Supp. 205, 208 (W.D.N.C.1992); *and General Latex and Chemical Corp. v. Phoenix Medical Technology, Inc.,* 765 F.Supp. 1246, 1249 (W.D.N.C.1991).

As to the first prong of the analysis, N.C.G.S § 1–75.4 [1], the long-arm statute, is a legislative attempt to allow North Carolina Courts to assert personal jurisdiction to the full extent permitted by the due process clause and should be construed liberally in favor of finding personal jurisdiction. *Dillon v. Numismatic Funding Corp.,* 291 N.C. 674, 676, 231 S.E.2d 629, 630 (1977); *Marion v. Long,* 72 N.C.App. 585, 586, 325 S.E.2d 300, 302, *rev. denied,* 313 N.C. 604, 330 S.E.2d 612 (1985); *Kaplan School Supply Corp. v. Henry Wurst, Inc.,* 56 N.C.App. 567, 570, 289 S.E.2d 607, 609, *petition denied,* 306 N.C. 385, 294 S.E.2d 209 (1982).

Therefore, the Fourth Circuit has stated that the normal two step inquiry merges into one, because the North Carolina long-arm statute allows the exercise of personal jurisdiction in all cases where such jurisdiction does not contravene due process.

---

**1.** N.C.G.S. § 1–75.4 states as follows (emphasis added):

"A court of this State ... has jurisdiction over a person ... under any of the following circumstances:

(1) Local Presence or Status.—in any action, whether the claim arises within or without this State, in which a claim is asserted against a party who ...

d. Is engaged in substantial activity within this State, whether such activity is wholly interstate, intrastate, or otherwise.

(5) Local Services, Goods or Contracts.—*in any action which ...*

b. *Arises out of services actually performed for the Plaintiff by the Defendant within this state ... "*

See, e.g., Ellicott Machine Corp., 995 F.2d at 477; Ramsey Products Corporation v. Morbark Industries, Inc., 823 F.2d 798, 802 (4th Cir.1987); Vishay Intertechnology, Inc. v. Delta International Corp., 696 F.2d 1062, 1065 (4th Cir.1982); and General Latex, 765 F.Supp. at 1249.

Accordingly, personal jurisdiction exists if the Plaintiff can satisfy the second prong of the test—that is, if Hertz Herson has established "minimum contacts" with North Carolina such that requiring them to defend an action in North Carolina would not offend traditional notions of fair play and substantial justice. International Shoe Company v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Minimum contacts exist "where a defendant has purposefully directed its activities at the residents of the forum state...." World–Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). Put another way, minimum contacts exist where the defendant has engaged in conduct creating a substantial connection with the forum state so that the defendant can be said to have purposefully "availed [it]self of the privilege of conducting business there." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475–76, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

The following factors are examined when determining whether minimum contacts with the forum state exist:

(1) The quantity of the contacts;

(2) The nature and quality of contacts;

(3) The source and connection of the cause of action with those contacts;

(4) The interest of the forum state and convenience;

(5) Whether the Defendant invoked benefits and protection of the laws of the forum state.

World–Wide Volkswagen Corp., 444 U.S. at 292, 100 S.Ct. 559; see also General Latex and Chemical Corp., 765 F.Supp. at 1249.

■ As set forth above with particularity, the record establishes that Hertz Herson has had at least "minimum contacts" with the State of North Carolina for many years. Specifically, the record establishes that Hertz Herson had performed accounting and other financial services for Regency's North Carolina operations since the early 1970's, involving numerous trips to North Carolina by multiple Hertz Herson partners and employees; performed additional services from time to time at the Regency factory in Catawba County, North Carolina, including consulting, overseeing the installation of a new computer system, recruiting a company comptroller, and designing, implementing, and maintaining cost control systems; and had performed services for other North Carolina businesses from time to time.

Numerous decisions have found the minimum contacts test satisfied with far less contact than is present in this case. See, e.g., Anita's New Mexico Style Mexican Food, Incorporated v. Anita's Mexican Foods Corporation, 201 F.3d 314, 319 (4th Cir.2000) (personal jurisdiction proper where defendant placed goods in the stream of commerce which were ultimately purchased in forum state); English & Smith v. Metzger, 901 F.2d 36, 38 (4th Cir.1990) (personal jurisdiction proper over out-of-state attorney who contacted attorney and made several phone calls and mailings into forum state); Hirschkop & Grad, P.C. v. Robinson, 757 F.2d 1499, 1502 (4th Cir.1985) (personal jurisdiction proper over out-of-state client whose contacts with forum state were only by phone or fax except for two brief personal visits); and Ciba–Geigy Corporation v. Barnett, 76 N.C.App. 605, 609, 334 S.E.2d 91, 93 (1985) (personal jurisdiction proper over sales representative who only came to North Carolina on one occasion for a week long sales meeting at company headquarters).

## III. ORDER

NOW THEREFORE, IT IS ORDERED:

1. "Defendants Louis L. Silver, Ronald Grossman, Kevin Creegan, and Regency Home Fashions, Inc.'s Motion to Compel Arbitration and Stay Litigation" (document # 5) and the "Motion of Defendant Hertz, Herson & Company, to Dismiss for Lack of Personal Jurisdiction, or, in the Alternative, for a More Definite Statement and Stay of Proceedings" (document # 7) are both **DENIED.**

2. The Defendants shall file Answer(s) to the Complaint *on or before June 9, 2000.*

3. The parties shall thereafter conduct the Initial Attorney's Conference, and shall so certify to the Court, in accordance with the Local Rules of the Western District of North Carolina. Following certification that the Initial Attorney's Conference has been held, the Court will schedule an Initial Pretrial Conference.

4. The Clerk is directed to send copies of this Memorandum and Order to counsel for the parties.