Morton v. Ivey, McClellan, Gatton & Talcott, LLP, 2013 NCBC 23.

| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| COUNTY OF MOORE | SUPERIOR COURT DIVISION |
| | 12 CVS 1298 |

JASON MORTON and ERIK HARVEY,

   Plaintiffs,

  v.

IVEY, MCCLELLAN, GATTON & TALCOTT, LLP,

   Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)

**ORDER ON MOTION TO COMPEL ARBITRATION**

{1} THIS MATTER is before the court on Defendant Ivey, McClellan, Gatton & Talcott, LLP's ("IMGT") Motion to Compel Arbitration ("Motion") pursuant to the North Carolina Revised Uniform Arbitration Act, N.C. Gen. Stat. § 1-569.1–569.31 ("RUAA"). For the reasons stated below, the Motion is GRANTED.

*Carolina Law Partners by Sophia Harvey for Plaintiffs.*

*Brooks, Pierce, McLendon, Humphrey & Leonard LLP by John W. Ormand III, Steven Wilson Quick, Craig D. Schauer, and Jeffrey E. Oleynik for Defendant.*

Gale, Judge.

## I. PRODECURAL BACKGROUND

{2} Plaintiffs initiated this action by Complaint dated October 19, 2012 ("Original Complaint"), alleging claims for: (1) breach of contract; (2) breach of the covenant of good faith and fair dealing; (3) breach of fiduciary duty; (4) constructive fraud; (5) unfair and deceptive trade practices; and (6) an accounting. On November 26, 2012 the matter was designated a mandatory complex business case by order of Chief Justice Sarah Parker and assigned to the undersigned. Plaintiffs' Original Complaint alleged that an oral partnership agreement between the Parties was

reached in December 2011, stated that Harvey "sent a written agreement memorializing the parties' December 2011 oral contract to Defendants" (Compl. ¶ 21), and included allegations supporting their claims against Defendant based on both the oral agreement and the written draft. On December 21, 2012, Defendant filed the present Motion, urging that each of the causes of action is subject to an oral agreement to arbitrate, as evidenced by an arbitration provision included in the written, but unsigned, partnership agreement. Plaintiffs filed an Amended Complaint on March 9, 2013 ("Amended Complaint"). In material part, the Amended Complaint repeated the allegations regarding the oral agreement reached in December 2011, but further alleged that no written partnership agreement was ever finalized. (Am. Compl. ¶¶ 22–25.) Defendant moved to dismiss the Amended Complaint on April 10, 2013.

{3}     The Motion has been fully briefed and is ripe for disposition.

## II.     FACTUAL BACKGROUND

A.     The Oral Partnership Agreement

{4}     Plaintiff Jason Morton ("Morton") is a citizen and resident of Moore County, North Carolina. (Am. Compl. ¶ 1.) Prior to becoming a partner in IMGT, Morton was a solo practitioner practicing in Moore County, North Carolina. (Am. Compl. ¶ 7.)

{5}     Plaintiff Erik Harvey ("Harvey") is a citizen of Forsyth County, North Carolina. (Am. Compl. ¶ 2.)

{6}     Defendant IMGT is a North Carolina limited liability partnership engaged in the practice of law. (Am. Compl. ¶ 3.)

{7}     Harvey was hired as an associate attorney by IMGT in August, 2009. (Am. Compl. ¶ 6.) In November, 2011, Harvey notified IMGT of his intent to resign. (Am. Compl. ¶ 8.) IMGT proposed an alternative arrangement whereby: (1) Harvey and Morton would become partners in IMGT; and (2) IMGT would be divided into an "A Group" comprised of the then-existing partners in IMGT and a "B Group"

made up of Harvey and Morton, with the B Group contributing all revenue to IMGT in exchange for a percentage of revenue based upon an agreed-upon formula.  (Am. Compl. ¶¶ 9–10.)  The B Group would concentrate in tax and consumer bankruptcy work.  (Am. Compl. ¶ 10.)

{8}     Plaintiffs allege that: "In late December 2011, Mr. Harvey orally informed [Talcott] that Plaintiffs accepted the terms of the partnership agreement . . . ," and Talcott indicated IMGT's acceptance of the same ("Oral Partnership Agreement"), and that pursuant to this agreement, Harvey and Morton became partners in IMGT effective January 1, 2012.  (Am. Compl. ¶¶ 13–14, 18.)

B.     Written Records Related to the Oral Partnership Agreement

{9}     After oral agreement was reached, Talcott asked Mike Wenig, an attorney at Tuggle Duggins, P.A., to prepare a draft of the Partnership Agreement. (Talcott Aff. ¶¶ 8–9, Ex. 1.)  Using that draft, Harvey and Talcott worked to revise the agreement and Harvey sent a proposed draft to Defendant in mid-December 2011.  (Am. Compl. ¶¶ 22–23; Talcott Aff. ¶¶ 11–12.)

{10}    All proposed drafts of the written Partnership Agreement contained the following provision:

> Should any controversy of any type arise hereunder which would require a judicial determination of such controversy, then such controversy shall be resolved by binding arbitration under the rules and regulations of the American Arbitration Association with each party to bear its own costs, fees and expenses associated therewith.

(the "Arbitration Provision") (Defs' Brief in Supp. of Mot. to Compel Arbitration and Mot. to Stay Pending Ruling [hereinafter Brief in Supp.] 2; Response 3; Gatton Aff. ¶11; Talcott Aff. ¶¶ 10, 13, Ex. 1, at ¶ 7, Ex. 2, at ¶ 9, Ex. 3, at ¶ 9(a), Ex. 4, at 9(a).)

{11}    No written Partnership Agreement was ever signed.  (Brief in Supp. 3; Resp. in Opp'n to Mots. to Compel Arbitration and Stay Proceedings [hereinafter Response] 4.)

{12}     After Harvey circulated a draft of the written Partnership Agreement, the Parties met in January, 2012 to discuss the draft.[1] (Response 2–3.) At the meeting, IMGT's partner Edwin R. Gatton ("Gatton") expressed his concern about the arbitration provision, but refrained from voting on the Partnership Agreement because he intended to retire in 2013. (Response 3; Def.'s Reply Br. in Supp. of Mot. to Compel Arbitration [hereinafter Reply] 2; Gatton Aff. ¶¶ 4, 9–10.) The other partners voted in favor of accepting the draft Partnership Agreement, but also agreed that a separate provision relating to malpractice insurance should be modified. (Brief in Supp. 3; Reply 2; Gatton Aff. ¶ 11; Talcott Supplemental Aff. ¶ 9.)

{13}     Harvey's copy of the draft Partnership Agreement includes handwritten notes reflecting Gatton's concerns and the agreed-upon change to the malpractice insurance provision. (Response 3–4, Ex. 2, at 10–11; Talcott Aff. ¶¶ 17–19, Ex. 4, at 11.)

C.     Actions After the January Meeting Reflecting the Oral Agreement

{14}     While the Parties agree that no draft of the written Partnership Agreement was ever signed, they acted pursuant to its terms between January 1, 2012 and May or June of 2012. (Am. Compl. ¶¶ 26–35; Brief in Supp. 1–3; Response 4, 6; Reply 3.)

{15}     Around May 2012, Plaintiffs accused Defendant of failing to perform according to the terms of the Partnership Agreement and advised Defendant they were terminating the Partnership Agreement. (Am. Compl. ¶¶ 30–34.) The Parties agreed to terminate the Partnership Agreement, effective June 15, 2012. (Am. Compl. ¶ 35; Brief in Supp. 3.)

{16}     The Parties conferred regarding their position on post-termination obligations. (Brief in Supp. 3; Response 4.) On June 18, Gatton sent a letter to Plaintiffs documenting attempts at negotiations and referring to possible litigation

---

[1] Plaintiffs also mention an earlier meeting in December 2011 to discuss the agreement. *Compare* (Response 2) *with* (Brief in Supp. 2–3).

and/or arbitration. (Response Ex. 3.) Gatton sent a second letter to Plaintiffs on June 26, 2012 stating that "once we decide that the negotiations are not proving to be fruitful (and they do not appear to be at this point) we will refer this matter to counsel, not for further negotiation, but for litigation." (Response Ex. 4, at 2.) Plaintiffs filed suit in Moore County on October 19, 2012.

## III.   ANALYSIS

{17}    If one party invokes arbitration and another contends that there is no enforceable agreement to arbitrate, § 569.7 of the RUAA requires the court to proceed summarily to decide the issue and order the parties to arbitrate unless it finds that there is no enforceable agreement to arbitrate. N.C. Gen. Stat. § 1-569.7(a)(2) (2013). Pursuant to § 569.7, the court is to determine whether an agreement to arbitrate exists and, if so, whether the controversy is subject to arbitration. *See Ellison v. Alexander*, 207 N.C. App. 401, 409, 700 S.E.2d 102, 109 (2010). These issues are for the trial court to determine, and the court may resolve contested issues to make that determination. *Routh v. Snap-On Tools Corp.*, 101 N.C. App. 703, 705–06, 400 S.E.2d 755, 757 (1991). Subject to the language of the arbitration agreement, a wide array of claims, including tort claims and assertions of unfair trade practices may be properly submitted to arbitration. *Rodgers Builders, Inc. v. McQueen*, 76 N.C. App. 16, 24–25, 331 S.E.2d 726, 731–32 (1985), *cert. denied,* 315 N.C. 590, 341 S.E.2d 29 (1986).

{18}    While the burden of proving an agreement to arbitrate may rest on the party seeking to compel arbitration, "North Carolina has a strong public policy favoring the settlement of disputes by arbitration," and "any doubt concerning the existence of such an agreement" or concerning whether a particular dispute falls within the scope of that agreement must be resolved in favor of arbitration. *Johnston Cnty. v. R. N. Rouse & Co.*, 331 N.C. 88, 91–92, 414 S.E.2d 30, 32 (1992).

## A.    The Existence of an Agreement to Arbitrate

{19}    "The trial court's finding with regard to whether there existed an arbitration agreement is a question of fact, to be determined by the trial court upon competent evidence," and "[i]n determining whether parties had a valid agreement to arbitrate, the court may consider evidence as to facts that are in dispute." *Se. Paper Grp., Inc. v. Sunburst Chems., Inc.*, 2012 NCBC LEXIS 15, at *3 n.1, *28 (N.C. Super. Ct. Mar. 13, 2012). "The law of contracts governs the issue of whether there exists an agreement to arbitrate." *Routh v. Snap-On Tools Corp.*, 108 N.C. App. 268, 271, 423 S.E.2d 791, 794 (1992) (citing *S. Spindle & Flyer Co., Inc. v. Milliken & Co.*, 53 N.C. App. 785, 786, 281 S.E.2d 734, 735 (1981)). "Before a valid contract can exist, there must be mutual agreement between the parties as to the terms of the contract." *Id.* at 273, 423 S.E.2d at 795 (citing *Normile v. Miller*, 313 N.C. 98, 108, 326 S.E.2d 11, 18 (1985)). "In the construction of a contract, the parties' intentions control." *Walker v. Goodson Farms, Inc.*, 90 N.C. App. 478, 486, 369 S.E.2d 122, 126 (1988).

{20}    Plaintiffs rely on several cases to contend that there can be no enforceable arbitration agreement because the Partnership Agreement was never signed. (Response 5 (citing *Sciolino v. TD Waterhouse Investors Servs., Inc.*, 149 N.C. App. 642, 645–46, 562 S.E.2d 64, 66–67; *Routh*, 108 N.C. App. 268, 423 S.E.2d 791; *Blow v. Shaughnessy*, 68 N.C. App. 1, 313 S.E.2d 868 (1984), *abrogated on other grounds as recognized in Battleground Veterinary Hosp., P.C. v. McGeough*, 2007 NCBC LEXIS 33, at *69 (N.C. Super. Ct. Oct. 19, 2007); *Supak & Sons Mfg. Co., Inc. v. Pervel Indus., Inc.*, 463 F. Supp. 177, 181 (E.D.N.C. 1978)).) However, each of these cases reflects the court's doubt whether the plaintiffs there ever saw or were aware of the arbitration provision upon which the defendant relied. *See, e.g. Blow*, 68 N.C. App. 1, 313 S.E.2d 868; *Supak & Sons*, 463 F. Supp. at 181; *Sciolino*, 149 N.C. App. at 646, 562 S.E.2d at 66–67. This case is quite different, with the Plaintiffs not only knowing of the agreement but actually having had a significant hand in drafting the agreement, which included the arbitration provision.

{21}    An agreement need not be signed to be enforceable, and a court may look to the actions of the parties to find a "meeting of the minds." *See Walker,* 90 N.C. App. at 486–87, 369 S.E.2d at 126–27 (finding a contract was formed and the terms in a written but unsigned agreement were assented to because "the parties . . . affirmatively acted upon their negotiations which tended to show the formation of an agreement"); *see also Miller & Long, Inc. v. Intracoastal Living, LLC*, 2011 NCBC LEXIS 19, at *21 (N.C. Super. Ct. June 21, 2011) (conduct can demonstrate agreement even though written agreement not signed); *Heater v. Heater*, 53 N.C. App. 101, 104–05, 280 S.E.2d 19, 21–22 (1981) (same).

{22}    Admittedly, the RUAA demands more than only oral evidence of an agreement to arbitrate.  Section 569.6 of the RUAA provides that "[a]n agreement *contained in a record* to submit to arbitration . . . is valid, enforceable, and irrevocable except upon a ground that exists at law or in equity for revoking a contract."  N.C. Gen. Stat. § 1-569.6(a) (2013) (emphasis added).  The RUAA defines a "record" as "information that is inscribed on a tangible medium . . . ."  N.C. Gen. Stat. § 1-569.1(6) (2013).  The RUAA became effective in 2004, modifying earlier provisions of North Carolina's Uniform Arbitration Act, which provided that "parties may agree in writing to submit to arbitration . . . or they may include in a written contract a provision for the settlement by arbitration of any controversy . . . ."  *Red Springs Presbyterian Church v. Terminix Co.*, 119 N.C. App. 299, 302, 458 S.E.2d 270, 273; *see also Crutchley v. Crutchley*, 306 N.C. 518, 522, 293 S.E.2d 793, 796 (1982).  This reflects a relaxation that the arbitration agreement must itself have been executed by the parties to an oral agreement whose terms are otherwise reflected in a written record.  *See Miller & Long*, 2011 NCBC LEXIS 19, at *21–24 (enforcing an unsigned but written agreement including an arbitration clause, while refusing to extend the arbitration provision to another agreement with no accompanying writing).

{23}    In order to determine the matter summarily as directed by the RUAA, the court elects pursuant to Business Court Rule 15.4 to decide the matter on the

written submissions without oral argument. Based on the pleadings and affidavits submitted, together with documents attached thereto, the court finds as follows:

- The Parties orally agreed to a Partnership Agreement in December 2011;
- In and after January 1, 2012, the Parties acted in accordance with their oral Partnership Agreement;
- The Parties reached a "meeting of the minds" as to the terms of the Partnership Agreement, which included the arbitration agreement reflected in the drafts of the unsigned written Partnership Agreement, at their January 2012 meeting;
- Plaintiffs were aware of and consented to the arbitration terms;
- Although Gatton may have expressed reservations about arbitration as reflected in Harvey's handwritten notations, the Parties agreed to the arbitration provision, and the possibility of a revised provision regarding malpractice coverage does not defeat the agreement to arbitrate;
- The evidence reflects no opposition by Plaintiffs to the arbitration provision (Reply 5);
- Defendant did not waive the right to arbitrate by threatening litigation;
- Plaintiffs have indicated their assent to the oral Partnership Agreement by their effort to enforce provisions of that oral Partnership Agreement, and their evidence to do so leans in favor of enforcing the arbitration provision contained in the written agreement reflecting that oral agreement. *See Ellen v. A.C. Schultes of Md., Inc.*, 172 N.C. App. 317, 321–22, 615 S.E.2d 729, 732–33 (2005); *see also Carter v. TD Ameritrade Holding Corp.*, 721 S.E.2d 256, 263; and
- The draft Partnership Agreement circulated by Harvey and assented to by IMGT, although unsigned, is a sufficient "record" to satisfy the requirement of § 569.6(a) of the RUAA.

{24} In sum, the court determines and finds that there was a valid and enforceable agreement to arbitrate between the Parties contained in a record.

B.   The Dispute Falls Within the Scope of the Parties' Agreement to Arbitrate

{25}   The Arbitration Provision provides that "[s]hould *any controversy of any type arise hereunder* which would require a judicial determination of such controversy, then such controversy shall be resolved by binding arbitration . . . ." (Response Ex. 2, at ¶ 9(a) (emphasis added).)

{26}   Each of the claims in Plaintiffs' Amended Complaint arises out of duties imposed by the Partnership Agreement between the Parties and clearly falls under the broad scope of this provision *See In re W. W. Jarvis & Sons*, 194 N.C. App. 799, 804, 671 S.E.2d 534, 537 (2009); (Am. Compl. ¶¶ 39, 41, 46–47, 53–55, 61–62, 68–69, 78, 81.)

IV.   CONCLUSION

{27}   For the reasons stated above, Defendants' Motion is GRANTED. Plaintiffs' claims shall be submitted to binding arbitration and this action is stayed pending conclusion of that arbitration.

IT IS SO ORDERED, this the 24th day of April, 2013.